IN THE CASE OF


UNITED STATES, Appellee

v.

Mark S. JACKSON, Staff Sergeant
U.S. Air Force, Appellant

No. 03-0336

Crim. App. No. 34419

United States Court of Appeals for the Armed Forces

Argued November 19, 2003

Decided March 23, 2004

EFFRON, J., delivered the opinion of the Court, in which
GIERKE, BAKER, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed
an opinion concurring in the result.

Counsel

For Appellant: Captain Andrea M. Gormel (argued); Colonel
 Beverly B. Knott, Major Andrew S. Williams and Captain James
 M. Winner (on brief); Major Jefferson B. Brown and Major
 Terry L. McElyea.

For Appellee: Major John C. Johnson (argued); Colonel LeEllen
 Coacher, Lieutenant Colonel Robert V. Combs, and Major James
 K. Floyd (on brief); Major Linette I. Romer.



Military Judge: M. R. Ruppert



THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer and enlisted members, Appellant was convicted, contrary to his pleas, of one specification of wrongful use of methamphetamine, in violation of Article 112a, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 912a (2000). He was sentenced to a bad-conduct discharge, confinement for 30 days, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed in an unpublished opinion.

On Appellant's petition, we granted review of the following modified issue:

> WHETHER BRADY v. MARYLAND AND R.C.M. 701
> REQUIRED THE GOVERNMENT TO DISCLOSE EVIDENCE
> REGARDING AN AUGUST 2000 BROOKS LAB
> DISCREPANCY REPORT TO DEFENSE COUNSEL PRIOR
> TO TRIAL.

For the reasons set forth below, we hold that the Government erred in failing to disclose this evidence and that the error was prejudicial.

## I. BACKGROUND

### A. PRETRIAL DISCOVERY: INFORMATION PERTAINING TO QUALITY CONTROL

In March 2000, Appellant provided a urine specimen during an unannounced inspection of his unit, which was stationed at

2

Nellis Air Force Base, Nevada. The unit forwarded the specimen to the Air Force Drug Testing Laboratory at Brooks Air Force Base (Brooks Laboratory), Texas. The Brooks Laboratory performed a urinalysis test on the specimen, which yielded a positive test for the presence of methamphetamine. A further test achieved the same result. After the results were certified by the Brooks Laboratory and transmitted to Appellant's unit, Appellant was charged with one specification of wrongful use of methamphetamine.

On May 26, 2000, defense counsel submitted a detailed pretrial discovery request to the Government. A substantial portion of the request sought information concerning testing procedures at the Brooks Laboratory, identifying a variety of specific forms of information regarding personnel and procedures involved in the testing process. One of the specific requests asked for "any reports, memos for record or other documentation relating to Quality Control and/or inspections pertaining to quality control at the Brooks Lab for the three quarters prior to [Appellant]'s sample being tested, and the available quarters since [Appellant]'s sample was tested." The defense submission also stated that the discovery request was a "continuing request" that "includes any information which you may later discover before, during or after trial of this case, or which is not requested in a specific manner."

The prosecution sent a memorandum to Brooks Laboratory on June 6, 2000, regarding discovery, which required it to provide only those items expressly identified in the memorandum as matters "deemed relevant to litigation." Instead of using the term "quarters" when referring to the time frame, the prosecution's memorandum to the Brooks Laboratory referred to "months," and did not include the continuing nature of the defense request. According to the memorandum, the Brooks Laboratory was required to provide only the following information:

> [C]opies of the Quality Assurance (QA) monthly reports and QA monthly inspections for the three months prior to testing [Appellant]'s specimen, the month of testing, and the month after testing. Please also provide the AFIP monthly proficiency reports for the three months prior to testing [Appellant]'s sample, the month of testing, and the month after testing.

On June 12, 2000, the prosecution sent a memorandum to the defense providing a variety of responses to the various defense requests. Some of the responses contained substantive information; some reported on the status of the request; others asserted that the requested information was not relevant and would not be provided; and still others asked the defense to narrow the request.

4

With respect to quality control, the prosecution's memorandum stated:

> The Quality Control quarterly inspections were discontinued after January 1999 when it became a Quality Assurance (QA) function. The QA monthly reports and QA monthly inspections for the three months prior to the member's specimen, the month of testing, and the month after testing have been requested from Brooks AFB Drug Testing Division.

In contrast to the prosecution's responses on other subjects, the memorandum did not ask the defense to narrow the scope of the request pertaining to quality control, nor did it assert that the Government was unwilling to provide documents within the request.

## B. THE REPORT OF AN ERRONEOUS TEST RESULT AT THE BROOKS LABORATORY

Two and a half months later, on August 2, the Brooks Laboratory mistakenly identified a specimen as positive despite the fact that the specimen was negative. This error was discovered as part of its quality control process, which involved the routine insertion of "Blind Quality Control" specimens in each batch of urine specimens provided by service members. The Blind Quality Control specimens were either "positive" -- containing a reportable presence of an illegal substance, or "negative" -- not containing a reportable presence

5

of an illegal substance.  Although the operators of the testing system knew that Blind Quality Control specimens were included in each testing batch, they did not know which specimens within a batch were the real specimens provided by service members and which were the Blind Quality Control specimens.

The error on August 2 occurred when Brooks Laboratory testing operators reported that a particular specimen produced a positive result for the presence of a metabolite of cocaine, even though the sample was a negative Blind Quality Control specimen.  As a result of this error, it generated a Discrepancy Report, which identified each individual who handled the negative Blind Quality Control specimen.  The Discrepancy Report stated that it was "inconclusive as to how the negative [Blind Quality Control specimen] came to have a positive result" and recommended "that each technician and observer pay closer attention" to their duties.

Three of the laboratory personnel who were identified as participating in the preparation and testing of the erroneously identified Blind Quality Control specimen in August also were involved in testing Appellant's several months earlier. Although the laboratory's report of the erroneous testing of a quality control specimen in August was generated a month before Appellant's trial while discovery was still ongoing, the report was not provided to the parties prior to trial.

6

C. TRIAL PROCEEDINGS

Defense counsel submitted additional discovery requests on September 14 and September 17, prior to the scheduled beginning of trial on the merits on September 25. Several days before trial, trial counsel and defense counsel had a discussion about discovery. Defense counsel asked the trial counsel to contact the Brooks Laboratory and obtain all reports completed between its June 6 response and the date of their discussion, as well as any other recently identified items that would be responsive to the initial discovery request. Throughout the trial, the defense received additional items from the Brooks Laboratory in response to the discovery request.
The defense, however, did not receive
the report of the erroneous test that had taken place in August.

At trial, the prosecution's case relied primarily on a litigation package prepared by the Brooks Laboratory detailing Appellant's positive urinalysis, along with expert extrapolation testimony by Dr. Vincent Papa, a forensic toxicologist and certifying official at the laboratory. Dr. Papa explained the contents of the litigation package and concluded that Appellant ingested methamphetamine. The prosecution also introduced evidence that: (1) Appellant "rolled his eyes," shook his head "in a no fashion," and "seemed a little upset" when his

7

superiors announced the unit sweep; (2) in the context of a discussion about evicting his girlfriend from his apartment, Appellant expressed "concerns that there may [have been] drugs in [his] residence"; and (3) that on two prior occasions, Appellant discussed teas or other substances that one could consume to produce a negative result in a urinalysis test.

The defense focused its trial strategy on attacking the reliability of the Brooks Laboratory positive urinalysis report. During cross-examination of Dr. Papa, defense counsel raised questions concerning the possibility that Appellant's positive urinalysis was the result of contamination in the testing process. Defense counsel highlighted fifteen prior incidents that the laboratory discovered four months prior to testing of Appellant's urine specimen in which the Chief of the Confirmation Section at Brooks Laboratory had altered data regarding the testing process. Defense counsel also noted that the Brooks Laboratory did not have a Quality Assurance Officer at the time Appellant's urine specimen was tested, and that that the Brooks Laboratory had received an inspection report critical of the quality of its testing procedures in place through April of that year. Defense counsel further noted that one urine specimen that was correctly identified as negative had been reported as positive as a result of an incorrect notation on the report. Defense counsel further pointed out that one individual

who handled Appellant's urine specimen subsequently had been
decertified because many of his April 2000 testing runs failed.
In addition, defense counsel explored the possibility that
methamphetamine could have been ingested innocently by
Appellant.

In his closing argument on findings, trial counsel relied
primarily on the positive urinalysis and Dr. Papa's testimony to
support the contention that Appellant knowingly and wrongfully
used methamphetamine.  To buttress the credibility of the
testing procedures at the Brooks Laboratory, trial counsel
asserted that --

> the military judge has told you [that] you
> are entitled to infer that the procedures in
> the lab for handling and testing the samples
> were regular and proper, unless you have
> evidence to the contrary.  This is a
> certified forensic laboratory.  Dr. Papa
> told you what it takes to have that happen
> and how easily . . . being two standard
> deviations off, could cause decertification
> as a forensic lab.  They call in these
> civilian places and pay them lots of money
> to do these studies . . . to pick them apart
> . . . .  All of that has to be thrust out
> into the public domain.  Everybody is going
> to know, because they are a forensic lab,
> and that is why, ladies and gentlemen, you
> could trust that they followed the rule.
> And if you haven't seen any evidence to the
> contrary in this case, you may assume that
> there were no problems.

Defense counsel's argument on findings attacked the
credibility of the positive urinalysis result and the litigation

package prepared by the Brooks Laboratory.  Following
instructions and deliberation the members announced a finding of
guilty to the charge and specification.


### D. POST-TRIAL DEVELOPMENTS

Eleven months after trial, appellate defense counsel first
learned of the August 2 error at the Brooks Laboratory.  On
appeal, Appellant contends the Government erred by failing to
disclose the report on the erroneous testing of the Blind
Quality Control specimen, violating his right to discovery under
the Rules for Courts-Martial, the UCMJ, and the Constitution.
See R.C.M. 701 (discovery); Article 46, UCMJ, 10 U.S.C. § 846
(2000)(opportunity to obtain witnesses and other evidence);
Brady v. Maryland, 373 U.S. 83 (1963)(discovery obligations as a
matter of due process; U.S. Const. Art. V and amend. XIV).


### II. DISCOVERY - TRIAL AND APPELLATE STANDARDS

Discovery in the military justice system, which is broader
than in federal civilian criminal proceedings, is designed to
eliminate pretrial "gamesmanship," reduce the amount of pretrial
motions practice, and reduce the potential for "surprise and
delay at trial."  Manual for Courts-Martial, United States (2002
ed.), Analysis of the Military Rules of Evidence A21-32.

United States v. Jackson, No. 03-0336/AF

Under R.C.M. 701(a)(2)(B), the Government must allow the defense, upon request, to inspect "[a]ny results or reports. . . of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of military authorities, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense."  In the absence of a defense request, R.C.M. 701(a)(6) requires the Government to disclose known evidence that "reasonably tends to" negate or reduce the accused's degree of guilt or reduce the punishment that the accused may receive if found guilty.  See United States v. Williams, 50 M.J. 436, 440 (C.A.A.F. 1999) (citing Brady).  These rules encompass "[e]vidence that could be used at trial to impeach" witnesses or other evidence presented by the Government.  Id.; see United States v. Watson, 31 M.J. 49, 54-55 (C.M.A. 1990)).

Discovery is not limited to matters within the scope of trial counsel's personal knowledge.  "[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the [G]overnment's behalf."  United States v. Mahoney, 58 M.J. 346, 348 (C.A.A.F. 2003)(quoting Strickler v. Greene, 527 U.S. 263, 281 (1999)).  "Trial counsel must exercise due diligence in discovering [favorable evidence] not only in his possession but also in the possession . . . of other

11

United States v. Jackson, No. 03-0336/AF

'military authorities' and make them available for inspection." United States v. Simmons, 38 M.J. 376, 381 (C.M.A. 1993). "[T]he parameters of the review that must be undertaken outside the prosecutor's own files will depend in any particular case on the relationship of the other governmental entity to the prosecution and the nature of the defense discovery request." Williams, 50 M.J. at 441. The parties bear a "[c]ontinuing duty to disclose" responsive evidence or material. R.C.M. 701(d).

If the Government fails to disclose discoverable evidence, the error is tested on appeal for prejudice, which is assessed "in light of the evidence in the entire record." United States v. Stone, 40 M.J. 420, 423 (C.M.A. 1994)(quoting United States v Agurs, 427 U.S. 97 (1976)). As a general matter, when an appellant has demonstrated error with respect to nondisclosure, the appellant will be entitled to relief only if there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed. When an appellant has demonstrated that the Government failed to disclose discoverable evidence with respect to a specific request or as a result of prosecutorial misconduct, the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt. See United States v. Roberts, ___ M.J. ___ (C.A.A.F. 2004).

12

III.  DISCUSSION

The August 2, 2000, report at issue in this case concerned the failure of the Brooks Laboratory to properly identify a "Blind Quality Control" specimen by reporting a "negative" specimen as "positive" for the presence of an illegal substance. This document is within the defense May 26, 2000 discovery request for reports or inspections "pertaining to quality control."  The report was generated on August 2, 2000, less than four months after Appellant's specimen was tested, and less than three months after the defense discovery request.  The defense asked for reports during "the three quarters prior to [Appellant]'s sample being tested, and the available quarters since," and further stated that this was a "continuing request" that included "any information which you may later discover before, during or after trial."  The report, which was generated a month before Appellant's trial, falls well within the temporal span of the defense discovery request.

The prosecution's June 12, 2000, response to the overall defense discovery request appropriately identified those items that the Government declined to provide.  The prosecution's response also asked the defense to narrow its request with respect to a number of other specific items.  In responding to the defense request for matters "pertaining to quality control," however, the prosecution did not assert that the Government

13

would decline to provide the requested information, nor did it ask the defense to narrow the scope of that request. The Government's response identified changes in the quality assurance program at the Brooks Laboratory, and described the reports that had been requested from it, covering the three months before Appellant's specimen was tested, the month of the testing, and the month after his specimen was tested. On appeal, the Government asserts that the defense waived the continuing nature of the discovery request by not objecting to the Government's response. We decline to infer waiver in this case. The defense made a specific request. The Government expressly identified those items where it rejected or sought to narrow the defense request, and did not identify matters "pertaining to quality control" as one of those items. The defense in this case could reasonably view the Government's response as informational in nature and was under no obligation to infer that the Government was rejecting the continuing nature of the defense request.

The failure to provide the requested information violated Appellant's right to discovery under R.C.M. 701(a)(2)(B). With respect to prejudice, we note that the prosecution's case rested primarily on the urinalysis, including the litigation package and Dr. Papa's testimony in support and in explanation of that package. Although the additional circumstantial evidence

14

introduced by the prosecution regarding Appellant's attitude on various occasions might have had some marginal value in rebutting defense suggestions of innocent ingestion, it did not constitute independent evidence of illegal drug use.

The defense focused its case primarily on the reliability of the laboratory process. What the defense did not have was a report, generated by the Government between the time of Appellant's urinalysis and the trial, demonstrating that the laboratory processes had misidentified a negative Blind Quality Control specimen as positive for the presence of drugs. The defense could have used the report to demonstrate the existence of quality control problems, and there is a reasonable probability that such evidence could have influenced the members' judgment about the reliability of the testing process.

A number of factors underscore the prejudicial impact of the failure to provide the August 2 report. First, the report provided evidence of potential errors in the testing process that was more compelling than the other information used by defense counsel in cross-examination of Dr. Papa. At trial, the prosecution argued that the deficiencies pointed out by defense were the result of identifiable problems that could not have occurred in Appellant's case. By contrast, the undisclosed August 2 report stated that "it is inconclusive as to how the negative [Blind Quality Control] came to have a positive

15

result," and then recognized the possibility of human error by recommending "that each technician and observer pay closer attention" to their tasks. This is particularly significant in light of the fact that three persons involved in the Blind Quality Control specimen performed the same tasks in preparation of Appellant's specimen.

Second, trial counsel emphasized that the defense had failed to demonstrate specific errors in the testing process, and contended that the weakness in the defense case served to validate the accuracy of Appellant's positive urinalysis result. Trial counsel stated during closing argument that, "the military judge has told you [that] you are entitled to infer that the procedures in the lab for handling and testing the samples were regular and proper, unless you have evidence to the contrary . . . [a]nd if you haven't seen any evidence to the contrary in this case, you may assume that there were no problems." Had the defense possessed the August 2 report at trial, the defense could have argued that the members had been presented with evidence of a specific problem in the testing procedures.

We conclude that the error deprived the defense of information that could have been considered by the members as critical on a pivotal issue in the case -- the reliability of the laboratory's report that Appellant's specimen produced a positive result. Given the significance of this information in

the context of Appellant's trial the error was prejudicial under the "harmless beyond a reasonable doubt" standard, see Roberts, ___ M.J. at ___ (standard of review applicable to specifically requested information), as well as under the standard advocated in the separate opinion in Roberts, ___ M.J. at ___ (Crawford, C.J., concurring in the result)(applying the standard of "a reasonable probability of a different result" in all cases, regardless of the specificity of the request or prosecutorial misconduct).

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed.  The findings and sentence are set aside.  A rehearing may be ordered.

CRAWFORD, Chief Judge (concurring in the result):

See my separate opinion in United States v. Roberts, ___ M.J. ___ (C.A.A.F. 2004)(concurring in the result).