IN THE CASE OF


UNITED STATES, Appellee

v.

Richard J. ISRAEL Jr., Airman First Class
U.S. Air Force, Appellant

No. 04-0217

Crim. App. No. 34877

_____

United States Court of Appeals for the Armed Forces

Argued October 20, 2004

Decided March 16, 2005

ERDMANN, J., delivered the opinion of the Court, in which
GIERKE, C.J., CRAWFORD, EFFRON, and BAKER, JJ., joined.

Counsel

For Appellant:  Captain David P. Bennett (argued); Colonel
Beverly B. Knott, Major Terry L. McElyea, Captain Antony B.
Kolenc, and Captain James M. Winner (on brief).

For Appellee:  Captain Stacey J. Vetter (argued); Colonel
LeEllen Coacher, Lieutenant Colonel Robert V. Combs, and Major
Michelle M. Lindo (on brief); Lieutenant Colonel Gary F.
Spencer.

Military Judge:  James L. Flanary


**This opinion is subject to editorial correction before final publication**.

United States v. Israel Jr., No. 04-0217/AF

Judge ERDMANN delivered the opinion of the Court.

Airman First Class Richard J. Israel Jr. entered a plea of not guilty to a specification alleging wrongful use of cocaine in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2000). He was tried and convicted by members at a general court-martial and sentenced to a bad-conduct discharge, confinement for six months, forfeiture of all pay and allowances, and a reduction in grade to E-1. The convening authority approved the findings and sentence and they were affirmed by the Air Force Court of Criminal Appeals in an unpublished decision. United States v. Israel, ACM 34877 (A.F. Ct. Crim. App. Oct. 27, 2003).

A defendant's right under the Sixth Amendment to cross-examine witnesses is violated if the military judge precludes a defendant from exploring an entire relevant area of cross-examination. United States v. Gray, 40 M.J. 77, 81 (C.M.A. 1994). The prosecution primarily relied upon Israel's positive urinalysis test[1] and the only defense raised by Israel was an attack on the reliability of the urinalysis testing process. Although the military judge allowed the defense counsel to conduct limited cross-examination regarding the possibility that errors might have occurred in the testing process, he excluded

---

[1] The Government did introduce the testimony from a friend of Israel concerning a statement that Israel may have made after the drug test. The testimony was equivocal and not probative.

2

most of the evidence that the defense offered in support of that possibility. We granted review to determine whether the military judge abused his discretion in excluding this evidence.[2]

## BACKGROUND

Israel tested positive for cocaine in an urinalysis drug test that was obtained during a unit sweep at MacDill Air Force Base (MacDill) on May 19, 2001. The sample was tested at the Brooks Air Force Drug Testing Laboratory (Brooks Laboratory) on May 30, 2001. The Government's witnesses testified as to the collection procedures at the base level and the testing procedures at Brooks Laboratory. Israel did not testify and his defense consisted of an attack on the reliability of the drug testing program through cross-examination.

## Base Collection Procedures

The MacDill Drug Testing Program Manager, Mr. Mahala, testified regarding the standard procedures for the collection of urine during a drug sweep and that those procedures were followed to collect Israel's urine. On cross-examination he

---

[2] We granted review of the following issue:
> WHETHER APPELLANT WAS DENIED MEANINGFUL CROSS-EXAMINATION OF KEY GOVERNMENT WITNESSES IN VIOLATION OF THE SIXTH AMENDMENT WHERE THE MILITARY JUDGE PREVENTED TRIAL DEFENSE COUNSEL FROM CONFRONTING THE WITNESSES WITH MATERIAL IMPEACHMENT EVIDENCE.

admitted that he did not have any direct recollection of collecting Israel's sample and that his testimony was based entirely on the standard procedures he used in testing. He stated, "I don't get away from my procedure at all, Sir."

Prior to the defense counsel's cross-examination of Mr. Mahala, the military judge addressed a motion in limine filed by the government that asked "that the defense counsel be precluded from presenting evidence on cross of Mr. Mahala, as well as be precluded from any mention at all of the Drug Demand Urinalysis' untestable rates ... from MacDill Air Force Base." In opposition to the motion, the defense argued that because an untestable sample indicates that something has gone awry in the collection or shipping process, this evidence would be probative with respect to "what the local lab did or did not do correctly for the month of June and for the month of March ... just prior to and just after the sample which was given in May."

The military judge excluded the evidence, finding that it was "irrelevant because what we're focusing on is this particular instance of the collection process. I don't think that the trial counsel has opened the door up to ... a general assault ... on the entire testing process forever, or within the first few months before or after."

Laboratory Procedures

Dr. Haley testified as an expert witness regarding the procedures used at the Brooks Laboratory for testing urine samples for cocaine: an immunoassay test is run on all samples; those samples that test positive undergo a second immunoassay test; if that second test is positive, the sample is tested a third time using the more intricate and more thorough gas chromatography/mass spectrometry (GC/MS) testing process. With regard to the GC/MS confirmation test, Dr. Haley testified that it is "considered the gold standard in drug testing[,]" and that it is an accurate test.

Dr. Haley walked the court through the document containing the test reports for Israel's urine screening and explained the process used in each of the three tests when a positive result is reached. She described the standard calibration procedures and other quality control measures taken by the lab with regard to the machines used in the testing process and the testing process as a whole. When asked how she could be sure of the test results, she responded, "Because ... the whole test is performing as it should. We've got all the knowns in there are [sic] coming out at the correct concentrations. If the instrument were having some problem where it was inaccurately detecting things, it would show up in the controls, as well."

Dr. Haley concluded that in her opinion the test produced

"valid results[,]" and that the urine tested was produced by the accused and tested positive for cocaine. On cross-examination, Dr. Haley testified that it is possible that "[s]ome mistakes will go undetected, but there are many precautions set up to catch those that would result in a report going out."

Prior to the cross-examination of Dr. Haley, a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), was held to address certain evidence that the defense sought to introduce during cross-examination. Israel's defense counsel argued that the areas he wished to explore challenged the reliability of Dr. Haley's conclusion that the urinalysis test result was valid and were therefore appropriate for cross-examination. The evidence that the defense wished to introduce related to the following incidents at Brooks Laboratory: a May 2001 calibration error; a 1997 incident where a laboratory employee, Ms. Solis, erroneously annotated a specimen sample; a 1999 incident where Mr. Hatziz, a laboratory employee, falsified documents to cover up an error; an August 2000 false-positive blind quality control sample; and log book errors in April of 2001. The military judge found that the evidence was "totally irrelevant for what we're here for .... None of that stuff has anything to do with this particular testing in this particular case."

6

During closing arguments, trial counsel reinforced the "gold standard" theme of the Government's case. He stressed the reliability of the urinalysis testing process, characterizing it as the "best," the "Mercedes" of drug testing and that "every precaution was taken" to ensure its accuracy "and every precaution was met." Trial defense counsel attempted to impeach the processes used by the laboratory by noting the possibility that mistakes were made and arguing that "you can't report a mistake you didn't find." On rebuttal, the Government again stressed the presumption of regularity inherent in the standard procedures of the laboratory.

## DISCUSSION

Israel argues that the military judge's rulings unreasonably restricted his ability to cross-examine witnesses and violated his Sixth Amendment rights. See United States v. Bahr, 33 M.J. 228, 232 (C.M.A. 1991). Trial rulings limiting cross-examination are reviewed for abuse of discretion. United States v. Shaffer, 46 M.J. 94, 98 (C.A.A.F. 1997) (citing United States v. Buenaventura, 45 M.J. 72, 79 (C.A.A.F. 1996)).

A defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry. See United States v. Atwell, 766 F.2d 416, 419-20 (10th Cir. 1985). Because the

7

United States v. Israel Jr., No. 04-0217/AF

alleged errors affect Israel's constitutional right to confront the witnesses against him, if we find that the military judge abused his discretion, we will reverse unless the "error was harmless beyond a reasonable doubt." Bahr, 33 M.J. at 231 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)); see also United States v. Gray, 40 M.J. 77 (C.M.A. 1994).

We find that while the military judge correctly excluded much of the offered evidence, he abused his discretion in excluding evidence of the MacDill untestable rates, the Brooks Quality Control Report regarding an unacceptable calibrator, and the August 2, 2000, false-positive blind quality control sample. We further find that these errors were not harmless beyond a reasonable doubt.

MacDill Untestable Rates

Mr. Mahala testified on cross-examination that he did not have any direct recollection of collecting Israel's sample and that his testimony was based on the standard procedures he used in collecting urine samples during a unit sweep. His testimony relied on a presumption of regularity -- that those standard procedures were followed in Israel's case. The evidence offered by Israel to challenge this testimony concerned the untestable rates for MacDill from the months of March and June. The untestable samples produced by the MacDill drug program during

8

those months indicate some type of irregularity in the collection or shipping process.

Evidence of these irregularities could have been used to attack Mr. Mahala's testimony that the standard procedures always were followed and those procedures were reliable. Because this evidence of irregularities in the collection process was closely related in time to the collection of Israel's sample, we find that the military judge abused his discretion in excluding this evidence from use by the defense on cross-examination.

## Brooks Calibration Error

Dr. Haley testified regarding the standard procedures used at the Brooks Laboratory for testing urine samples for cocaine. She described the standard calibration procedures and other quality control measures taken by the lab with regard to both the machines used in the testing process and the testing process as a whole.

In May 2001 there was a failed run of the testing process because of an unacceptable calibrator. The calibration error was caught and the test in that case was rerun. There was also a calibration error in the batch that contained Israel's specimen, which caused a control sample to read positive erroneously. The error caused the batch in Israel's case to be rerun as well. Defense counsel argued that the quality control

report reflecting the earlier error should be admissible to show that errors could, and did, occur in the calibration of the machines. As noted, the military judge excluded the evidence as being irrelevant.

The evidence in question concerned a calibration error that occurred in May 2001, the same month in which Israel's sample was collected and tested. Evidence that the same error had occurred more than once in the same month could have been used to raise questions about the reliability of the machines used in the testing process and therefore to question the reliability of the results of the test. Considering Dr. Haley's generalized testimony that relied upon the "gold standard in drug testing" and a presumption of regularity in the testing process, the military judge's ruling deprived Israel of the opportunity to meaningfully challenge that presumption of reliability.

In those cases where the Government relies on the general reliability of testing procedures, evidence related to the testing process that is closely related in time and subject matter to the test at issue may be relevant and admissible to attack the general presumption of regularity in the testing process. We therefore find that the military judge abused his discretion in excluding this evidence.

## False-Positive Blind Quality Control Sample

On August 2, 2000, one of the quality control samples known by the lab to be negative for cocaine erroneously tested positive in a run of the GC/MS test. As a result the entire batch tested in that run was discarded and the test was rerun. No explanation for the error was ever given.

Barbara Rohde was the aliquoter on the batch that had produced this false positive and while her name appears on the chain of custody for Israel's sample, she did not handle the sample until June 7, after the testing was complete. Defense counsel sought to introduce this evidence to show that there had been an error in the testing process in the past, and to test Dr. Haley's knowledge regarding the lab and the people involved in the testing process "and her ability to give an opinion as to whether or not this is a valid litigation package."

In United States v. Jackson, 59 M.J. 330 (C.A.A.F. 2004), this Court dealt with the same report as the one Israel sought to introduce, although in the context of a discovery request. In Jackson we found error in the Government's failure to produce the report in response to a discovery request and characterized the report as potentially "critical on a pivotal issue in the case -- the reliability of the laboratory's report that Appellant's specimen produced a positive result." Id. at 335-36. In Jackson, the laboratory testing error occurred less than four

months from the test procedure, while in this case it occurred more than nine months prior to the collection and testing of Israel's sample.

While a period of nine months between a laboratory error and the testing process may well be too remote in other cases, under the circumstances of this case it is not. The reliability of the testing process will always be relevant in drug test cases to establish the admissibility of the test results. Where the Government goes well beyond establishing reliability and raises the bar by characterizing the testing process as a "Mercedes" and that the process is the "gold standard" in drug testing, it opens the door to a broader time frame during which laboratory errors may be relevant to challenge the testing process. For this reason, we find that the military judge abused his discretion in excluding this report.

Remaining Allegations of Error

Errors by Ms. Solis

In May 1997 Ms. Solis, who is an employee of the Brooks Laboratory, inadvertently annotated a negative specimen as positive on a report.[3] Dr. Haley testified that Ms. Solis was involved with verifying the test results from Israel's sample.

---

[3] The defense also argued that another employee of the laboratory, Dr. Papa, was involved in both tests. Dr. Papa's role in the earlier test, however, was unrelated to the error that occurred.

Israel's counsel sought to use this information to explore the fact that errors had been made in the past, and to test Dr. Haley's knowledge of those errors and the impact that knowledge had on her testimony.

We conclude that the military judge did not abuse his discretion in excluding evidence of the May 1997 error by Ms. Solis. The only connection claimed by trial defense counsel with regard to this evidence was that Ms. Solis was involved both in the earlier error and with Israel's test. However, Ms. Solis's only involvement with Israel's test was in reviewing data, not annotating specimens and, in any event, there was no annotation error with Israel's sample. The evidence of this error is too far removed in both subject matter and time to be relevant to the reliability of the test results.

### Incident Involving Mr. Hatzis

In November 1999 there was an incident in which Mr. Hatziz made a testing error and then deliberately falsified documents to cover up that error. Following the discovery of this misconduct, a report called a "Retention Times Summary Report" was added to the standard litigation package. Defense counsel sought to introduce this information to explain why the "Retention Times Summary Report" was included in the litigation package even though nothing in that report was at issue at trial.

13

United States v. Israel Jr., No. 04-0217/AF

The military judge did not abuse his discretion in excluding evidence of misconduct by Mr. Hatzis that occurred in November 1999.  This incident was not related to Israel's test other than it took place at the same laboratory.  It occurred one and a half years prior to the testing of Israel's sample and Mr. Hatzis was no longer employed at the laboratory when Israel's sample was tested.  The evidence was too remote in time and subject matter to be relevant to challenge Dr. Haley's conclusion that the urinalysis test results were valid.

Log Book Errors

To test Dr. Haley's knowledge about lab procedures and possible security breaches at the laboratory, the defense sought to introduce evidence of an April 2001 incident in which individuals were allowed to access areas of the Brooks Laboratory without escorts or were not properly logged into or out of the lab.  During the Article 39(a) hearing, Dr. Haley stated that her only knowledge regarding those incidents related to some entries on a log where cleaning crew members were logged in but not properly logged out.  She did not remember that any of the incidents involved the storage room where specimens were kept, but only the room where papers were kept.

Evidence of minor errors in the log book that did not concern the area where the samples were tested or stored is neither probative of nor relevant to the reliability of the

14

testing process.  Accordingly, we find that the military judge did not abuse his discretion in excluding this evidence.

Prejudice

Where an error constitutes a violation of the defendant's constitutional rights, we will reverse unless the "error was harmless beyond a reasonable doubt."  Bahr, 33 M.J. at 231 (quoting Van Arsdall, 475 U.S. at 684).  Here, the military judge limited Israel's cross-examination in a manner that precluded him from exploring the possibility that the urinalysis testing process suffered from irregularities.

Israel needed to be able to point out possible irregularities in the testing process to show that there may have been errors that went undetected, and that the positive result presented by the prosecution may have been unreliable. The military judge's rulings precluded Israel from responding to the Government's case because they kept from him the tools he needed to attack the reliability of the urinalysis testing process.  While the military judge noted that evidence of errors in controlled testing procedures was evidence that the process was working properly, arguments that the process has had irregularities in the past are better made to the fact-finder.

Presenting the possibility that the positive result from the urinalysis test was unreliable was Israel's best defense to the Government's "gold standard" theory of the case.  By

15

United States v. Israel Jr., No. 04-0217/AF

precluding any meaningful inquiry into those relevant irregularities in the process, Israel was deprived of the opportunity to confront the "gold standard" theory properly.

"The possibility of a positive result from an error in the test ... is the worst nightmare of every good servicemember and a cause of serious concern to the judicial system." United States v. Campbell, 50 M.J. 154, 160 (C.A.A.F. 1999). It is impossible to say that the members would not have taken evidence of irregularities in the testing process and possible errors in the results into consideration. Having found that evidence of the untestable rates at MacDill Air Force Base, the false-positive blind quality control sample and the Quality Control Report were erroneously excluded, we conclude that the error was not harmless beyond a reasonable doubt.

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed. The finding and sentence are set aside and the record of trial is returned to the Judge Advocate General of the Air Force. A rehearing is authorized.

16