UNITED STATES, Appellee

v.

Hector R. GONZALEZ Jr., Airman First Class
U.S. Air Force, Appellant

No. 03-0394

Crim. App. No. 34691

United States Court of Appeals for the Armed Forces

Argued October 19, 2005

Decided February 1, 2006

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and CRAWFORD, EFFRON, and BAKER, JJ., joined.

Counsel

For Appellant:  Captain John N. Page III (argued); Colonel
Carlos L. McDade, Colonel Beverly B. Knott, Major Terry L.
McElyea, Major Sandra K. Whittington, and Captain Jennifer K.
Martwick (on brief).

For Appellee:  Major Jin-Hwa L. Frazier (argued); Lieutenant
Colonel Robert V. Combs, Lieutenant Colonel Gary F. Spencer, and
Major John C. Johnson (on brief); Captain Matthew J. Mulbarger.

Military Judge:  Kirk R. Granier


**This opinion is subject to revision before final publication.**

United States v. Gonzalez Jr., No. 03-0394/AF

Judge ERDMANN delivered the opinion of the court.

Airman First Class Hector Gonzalez pled guilty to wrongful possession of marijuana in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2000). Gonzalez pled not guilty to wrongful use of ecstasy and carrying a concealed weapon in violation of Articles 112a and 134 of the UCMJ, respectively. 10 U.S.C. §§ 912a, 934 (2000). He was convicted on all of the charges and sentenced to a bad-conduct discharge, 148 days of confinement, forfeiture of all pay and allowances and a reduction in grade to E-1. The convening authority approved the sentence and the findings and sentence were affirmed by the United States Air Force Court of Criminal Appeals in an unpublished opinion. United States v. Gonzalez, No. ACM 34691, 2003 CCA LEXIS 57, 2003 WL 827254 (A.F. Ct. Crim. App. Feb. 28, 2003). On appeal, this court set aside the Air Force court's decision and remanded for reconsideration of a specified issue. United States v. Gonzalez, 59 M.J. 159 (C.A.A.F. 2003). Following the Air Force court's ruling on remand, United States v. Gonzalez, No. ACM 34691, 2004 CCA LEXIS 198, 2004 WL 1944723 (A.F. Ct. Crim. App. Aug. 17, 2004), this court again granted review.

Where the Government fails to disclose discoverable material pursuant to a specific request, "the appellant will be entitled to relief unless the Government can show that

2

nondisclosure was harmless beyond a reasonable doubt." United States v. Roberts, 59 M.J. 323, 327 (C.A.A.F. 2004). We have previously held that the Government's failure to turn over a Brooks Laboratory Discrepancy Report was error under Rule for Courts-Martial (R.C.M.) 701(a)(2)(B). United States v. Jackson, 59 M.J. 330, 335 (C.A.A.F. 2004). We have also held that the Government's failure to turn over the Discrepancy Report is to be treated as prejudicial error where the other available evidence does not constitute "independent evidence of illegal drug use." Id. Where there is sufficient independent evidence of illegal drug use, the Government's error may be treated as harmless. We granted review in this case to determine if there was sufficient independent evidence that Gonzalez had wrongfully used ecstasy. We also considered whether defense counsel was ineffective in failing to discover that that the Discrepancy Report was not provided.[1] We find that the Government's failure to turn over the report was erroneous, but that the error was

---

[1] We granted review of the following issues:

> WHETHER BRADY v. MARYLAND, 373 U.S. 83 (1963), AND R.C.M. 701 REQUIRED THE GOVERNMENT TO DISCLOSE EVIDENCE REGARDING AN AUGUST 2000 BROOKS LAB ANALYTICAL FALSE POSITIVE URINALYSIS RESULT AND PREJUDICIALLY ERRED IN FAILING TO DO SO.

> WHETHER THE COURT OF CRIMINAL APPEALS ERRED ON REMAND WHEN IT FOUND NO INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE DEFENSE COUNSEL FAILED TO DISCOVER EXCULPATORY EVIDENCE REGARDING AN AUGUST 2000 BROOKS LAB ANALYTICAL FALSE POSITIVE URINALYSIS RESULT.

harmless beyond a reasonable doubt.  We also find that that
Gonzalez was not denied effective assistance of counsel.

BACKGROUND

Agents from the Air Force Office of Special Investigations
(OSI) called Gonzalez into their office for questioning after a
pacifier believed to belong to Gonzalez was found at the Central
Quarters (CQ) desk in Gonzalez's dormitory.  The Military
Training Leader who found the pacifier knew that Gonzalez had no
children and that pacifiers are considered drug paraphernalia
associated with ecstasy use.  During the OSI interview Gonzalez
admitted to sucking on the pacifier found at the CQ desk and
attending at least one "rave" party.  He claimed that he
innocently ingested ecstasy at that rave and he expressed
familiarity with the effects of ecstasy.  Gonzalez consented to
a search of his dormitory room, his car and a rental car.  The
search uncovered two more pacifiers and more than a dozen fliers
advertising raves.

Gonzalez also consented to a urinalysis, which was positive
for ecstasy,[2] and the observer from his drug test testified that
Gonzalez behaved oddly during the test, stating that he was
"excited" and "talkative" and that "his eyes were a little

---

[2] There was testimony at trial that the metabolites found in
Gonzalez's urine could not have been the result of the alleged
innocent ingestion incident, which had allegedly occurred
sixteen days earlier.

glassy." Several months later, Gonzalez's car was searched as he tried to enter Sheppard Air Force Base because Security Forces had reason to believe that Gonzalez had stolen a gun. The search turned up a weapon, as well as a baggie of marijuana.

Gonzalez's urine sample was tested by the Air Force Drug Testing Laboratory at Brooks Air Force Base in early September 2000. Aware that the Government would rely heavily on the results of his drug test, Gonzalez made several discovery requests for background information relevant to the drug-testing program at the Brooks Lab. He asked for reports created at or written about the Brooks Lab, particularly those concerning inspections, "false positives" and "false negatives", contamination, misplacement and mishandling of samples, and any testing, processing or administrative errors. He also asked for reports written in the month Gonzalez's sample was tested as well as several preceding and following months.

In response the Government produced quality assurance monthly inspection reports for June through October 2000. The Government also produced five months of quality control monthly reports, including a report dated August 10, 2000, which included the annotations "BQC Unacceptable – 1," and "Technician Error – 1". The Government also produced fourteen discrepancy

reports, including five from August 2000 and one from September 2000.[3]

The Government did not, however, produce an August 2, 2000 Discrepancy Report, which explained that on July 31, 2000 the lab had improperly identified a negative "blind quality control" specimen as positive for cocaine metabolites. That report also explained that no conclusion could be drawn about what caused the false positive result and that all lab personnel were encouraged to "pay closer attention" to their tasks. The false positive quality control sample was processed by the lab one month before Gonzalez's sample was tested and at least one of the employees who handled the misidentified quality control sample also handled Gonzalez's sample.

It is of some significance that the Discrepancy Report which was not produced was the only one that described a false positive result. The others produced by the Government concerned ten incidents where the intralaboratory chain of custody was broken -- including several instances of employees forgetting to properly sign or annotate the chain of custody sheet, one where a chemist failed to perform an "in-run prime"

_____

[3] A discrepancy report is generated any time the Quality Assurance section of the Brooks Lab determines that there was some deviation from standard procedures or some problem with a quality control sample. The report identifies each individual who handled the specimen in question, reaches a conclusion about the cause and impact of the error and makes a recommendation about how similar problems can be avoided in the future.

when restarting the equipment after a mechanical failure, one instance of unacceptable chromatography, and two incidents of improperly performed extractions.

At trial, Lieutenant Colonel Dale Haak, an Army Drug Testing Program Manager and expert in forensic toxicology and biochemistry, testified concerning the results of Gonzalez's drug test, as well as the Brooks Lab quality control procedures. He testified about the difference between internal and external, and open and blind quality controls. He testified that Brooks Lab has never misanalyzed an external quality control sample and that there was no error with regard to the controls run in the same batch as Gonzalez's sample. On cross-examination, however, Haak testified that internal blind quality control samples come back with incorrect results approximately two percent of the time.

## DISCUSSION

I.  Failure to Produce August 2 Discrepancy Report

Rule for Courts-Martial 701 (a)(2)(B) requires the Government, upon request, to turn over "results or reports . . . of scientific tests or experiments" that are "material to the preparation of the defense."  When a defendant makes a specific request for discoverable information, it is error if the Government does not provide the requested information, and "the appellant will be entitled to relief unless the Government can

show that nondisclosure was harmless beyond a reasonable doubt." Roberts, 59 M.J. at 327. Harmless beyond a reasonable doubt is a high standard, but it is not an impossible standard for the Government to meet. See Neder v. United States, 527 U.S. 1, 18 (1999) ("To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'") (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)); United States v. Vazquez-Rivera, 407 F.3d 476, 489-90 (1st Cir. 2005) (describing harmless beyond a reasonable doubt as "an extremely difficult, but not impossible, standard to meet"). We have previously held that the Government's failure to turn over the August 2 Discrepancy Report should be treated as prejudicial error where the other available evidence does not constitute "independent evidence of illegal drug use." Jackson, 59 M.J. at 335.

There is no dispute in this case that Gonzalez made a specific request for documents concerning the operations and accuracy of the Brooks Lab. It is equally clear that the Government did not produce the August 2 Discrepancy Report. The Government's failure to provide the Discrepancy Report violated Gonzalez's right to discovery under R.C.M. 701(a)(2)(B).

United States v. Gonzalez Jr., No. 03-0394/AF

Jackson, 59 M.J. at 335.  Thus, there was error and the burden is on the Government to show that it was harmless beyond a reasonable doubt.

With respect to prejudice, this case differs from our prior cases due to the level and character of the independent evidence of illegal drug use.  See Jackson, 59 M.J. at 335; see also United States v. Israel, 60 M.J. 485, 486 (C.A.A.F. 2005).  In addition to the positive drug test, the prosecution introduced independent evidence of drug use including evidence that Gonzalez had drug paraphernalia associated with ecstasy both in his car and at his work station, and that he had sucked on at least one of the pacifiers.[4]  Gonzalez also admitted that he attended at least one rave party and had fliers for thirteen rave parties in his car.  Although drug use is not a necessary element of a rave, the two are often linked.[5]

---

[4] Pacifiers are linked to ecstasy because they alleviate the involuntary tightening of the jaw muscles and grinding of the teeth that can be caused by ecstasy use.  See McClure v. Ashcroft, 335 F.3d 404, 407 (5th Cir. 2003).

[5] Merriam-Webster's Collegiate Dictionary defines a rave as "a large overnight dance party featuring techno music and usu[ally] involving the taking of mind-altering drugs."  Merriam-Webster's Collegiate Dictionary 1033 (11th ed. 2004); see also Nat'l Drug Intelligence Center, U.S. Dep't of Justice, Information Bulletin:  Raves, Prod. No. 2001-L0424-004 (Apr. 2001), available at http://www.prevlink.org/clearinghouse/catalog/drugs/club_drugs/raves.pdf (last visited Feb. 1, 2006) ("While techno music and light shows are essential to raves, drugs such as MDMA . . . [ecstasy], ketamine, GHB . . . , Rohypnol, and LSD . . . , have become an integral component of the rave culture."); United

9

Gonzalez also admitted to prior drug use and to possession. He told investigators that he innocently ingested ecstasy at a rave he attended and testified that he was familiar with its effects. The observer at Gonzalez's drug test testified that he behaved oddly during the test and that he was "excited" and "talkative" and that "his eyes were a little glassy." Additionally, Gonzalez pled guilty to possessing marijuana.

We have taken into account the available independent evidence that Gonzalez used ecstasy and weighed that evidence against the claimed error. Although the missing Discrepancy Report may have raised some questions about the accuracy of the testing process at the Brooks Lab, we also considered that Gonzalez's urine sample was subjected to four different tests, each of which showed positive for ecstasy use. When the missing report is balanced with the evidence arrayed against Gonzalez, the scales tip strongly in favor of Gonzalez's conviction. Thus, we conclude that the Government's error in failing to produce the Discrepancy Report was harmless beyond a reasonable doubt.

---

States v. Price, No. ACM 33503, 2001 CCA LEXIS 103, at *10, 2001 WL 322121, at *3 (A.F. Ct. Crim. App. Mar. 30, 2001) (defining a rave as "a dance or music party at which drugs are known to be readily available"); People v. Fitzner, No. 233210, 2002 Mich. App. LEXIS 1885, at *1 n.2 2002 WL 31947943, at *1 n.2 (Mich. Ct. App. Dec. 3, 2002) ("a 'rave' party is marked by dancing, music and drugs, often in an abandoned warehouse and typically 'after hours'").

Our finding of harmlessness is further supported by testimony elicited at trial concerning internal blind quality control error rates at the Brooks Lab. Although the August 2 Discrepancy Report was not produced, defense counsel had sufficient information to attack the reliability of the laboratory testing process. During the cross-examination of Haak, defense counsel elicited testimony that approximately two percent of internal blind aliquots are reported as false positives or with other incorrect results. Thus, while the Government's failure to produce the Discrepancy Report remains error, the evidence the defense would have introduced if it had the Discrepancy Report would have been to some degree cumulative of the overall false positive rate already in evidence. In addition, Gonzalez was tried by a military judge sitting alone. The expert testimony provided by Haak was of a type that is regularly considered by military judges. Accordingly, it is unlikely that the missing Discrepancy Report would have had a substantial impact on the military judge's ruling in light of the four different positive test results that were also in evidence.

## II. Ineffective Assistance of Counsel

Servicemembers are guaranteed the right to effective assistance of counsel at trials by court-martial. United States v. Davis, 60 M.J. 469, 473 (C.A.A.F. 2005) (citing United States

v. Knight, 53 M.J. 340, 342 (C.A.A.F. 2000)).  Gonzalez alleges

that he received ineffective assistance of counsel because his

counsel failed to determine, based on the documents produced by

the Government, that the August 2 Discrepancy Report existed and

had not been produced.

    Under Strickland v. Washington, 466 U.S. 668, 687 (1984),

Gonzalez must show both that his counsel's performance was

deficient and that the deficiencies were so serious as to

deprive him of a fair trial.  An appellant "who seeks to

relitigate a trial by claiming ineffective assistance of counsel

must surmount a very high hurdle."  United States v. Saintaude,

61 M.J. 175, 179 (C.A.A.F. 2005) (quoting United States v.

Moulton, 47 M.J. 227, 229 (C.A.A.F. 1997) (quotation marks

omitted)).  There is a presumption that counsel provided

adequate professional service.  United States v. Garcia, 59 M.J.

447, 450 (C.A.A.F. 2004).  This presumption is rebutted only by

"a showing of specific errors made by defense counsel that were

unreasonable under prevailing professional norms."  Davis, 60

M.J. at 473 (citing United States v. McConnell, 55 M.J. 479, 482

(C.A.A.F. 2001)).  In addition, even where counsel made an

error, the error must have been so prejudicial "as to indicate a

denial of a fair trial or a trial whose result is unreliable."

Davis, 60 M.J. at 473 (citing United States v. Dewrell, 55 M.J.

131, 133 (C.A.A.F. 2001)).  As we have previously explained,

United States v. Gonzalez Jr., No. 03-0394/AF

this court applies a three-prong test to determine if the

presumption of competence has been overcome:

> (1) Are the allegations true; if so, "is there a reasonable explanation for counsel's actions?";
>
> (2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance . . . [ordinarily expected] of fallible lawyers?"; and
>
> (3) If defense counsel was ineffective, is there a "reasonable probability that, absent the errors," there would have been a different result?

Garcia, 59 M.J. at 450 (citing United States v. Grigoruk, 56

M.J. 304, 307 (C.A.A.F. 2002)). Where the case can be resolved

by addressing the third prong -- the question of prejudice --

first, the court need not determine whether counsel's

performance was deficient. United States v. Quick, 59 M.J. 383,

386 (C.A.A.F. 2004) (citing Strickland, 46 U.S. at 697).

Applying the Grigoruk three-prong test, we find that

Gonzalez did not receive ineffective assistance of counsel

because there is no reasonable probability that the missing

Discrepancy Report would have produced a different result. As

we noted above, there was enough independent evidence that

Gonzalez used ecstasy that the Government's failure to turn over

the report was harmless error. For the same reasons, we cannot

say that if defense counsel had read all of the materials that

were produced, drawn all reasonable inferences and conclusions

from the materials and made further inquiry into the meaning of

United States v. Gonzalez Jr., No. 03-0394/AF

the notations "BQC Unacceptable – 1" and "Technician Error – 1," any additional documents that might have been produced by the Government would have changed the outcome of this case, especially in light of the fact that it was a bench trial.  As Gonzalez has not established that his counsel's performance prejudiced the outcome of his case, he has not established that his Sixth Amendment right to counsel was violated.

## DECISION

The decision of the Court of Criminal Appeals for the United States Air Force is affirmed.