# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

### No. 201300425

_____

### UNITED STATES OF AMERICA
Appellee

v.

### MARK A. THOMPSON
Major (O-4), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Charles C. Hale, USMC.
Convening Authority: Superintendent, U.S. Naval Academy, Annapolis, MD.
Staff Judge Advocate's Recommendation: Captain R.J. O'Neil, JAGC, USN.
For Appellant: Major M. Brian Magee, USMC; Lieutenant Jacob E. Meusch, JAGC, USN.
For Appellee: Lieutenant Commander Justin C. Henderson, JAGC, USN; Major Cory A. Carver, USMC.

_____

Decided 13 June 2017

_____

Before GLASER-ALLEN, HUTCHISON, and JONES, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

JONES, Judge:

A panel of members sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of violating a lawful

general order, one specification of committing an indecent act, and two specifications of conduct unbecoming an officer and a gentlemen, in violation of Articles 92, 120, and 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, and 933. The convening authority (CA) approved the adjudged sentence of 2 months' confinement, forfeiture of $2,500.00 pay per month for 24 months, and a reprimand.[1]

The appellant raises four assignments of error (AOEs): (1) the military judge erred when he instructed the members that "[i]f, based upon your consideration of the evidence, you are firmly convinced that the accused is guilty of the crime charged, you must find him guilty[;]"[2] (2) the military judge abused his discretion by precluding the appellant from cross-examining a complaining witness about a prior inconsistent statement she made against him; (3) the military judge abused his discretion by excluding evidence that a key government witness made prior inconsistent statements; and (4) the military judge abused his discretion in failing to eradicate apparent unlawful command influence from the appellant's trial.[3]

The first AOE has been resolved by our superior court against the appellant.[4] We disagree with the remaining AOEs and, finding no error materially prejudicial to the substantial rights of the appellant, affirm the findings and sentence. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In 2010, SS and AP were Naval Academy midshipmen, friends, and members of the Rifle Team. The appellant was a history professor at the Academy. The midshipmen met the appellant in the fall of 2010 when he became the Officer Representative for the Rifle Team. SS testified that she began a personal relationship with the appellant in February 2011, while traveling for a Rifle Team competition. SS further averred that the appellant ran with her during her physical training hours to assist her in getting in better physical shape, and that their relationship eventually turned physical.

---

[1] The Judge Advocate General of the Navy forwarded the appellant's case to the Navy-Marine Corps Appellate Review Activity on 12 February 2016, for review under Art. 69(d), UCMJ, 10 U.S.C. § 869(d) (2012). The court "may take action only with respect to matters of law." Art. 69(e), UCMJ, 10 U.S.C. § 869(e) (2012).

[2] Record at 1501.

[3] The appellant alleged three original AOEs and one Supplemental AOE, which we renumber as the fourth AOE.

[4] The Court of Appeals for the Armed Forces found no error in the use of the same challenged instruction in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017), and in accordance with that holding, we summarily reject this AOE. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

She claimed that she had sexual intercourse with the appellant in his home about five times including, on one occasion, a threesome with the appellant and another male Marine.

On 30 April 2011, AP and SS attended a Naval Academy croquet match where they drank alcohol throughout the day and into the evening.[5] SS then wanted to go to the appellant's home and confront him because she was upset and jealous that the appellant had "blown [her] off" for another female.[6] She convinced AP to go with her "for moral support."[7] According to the two midshipmen, the appellant invited them in and the three eventually began playing strip poker and drinking more alcohol. As the game wore on, AP became more intoxicated than the appellant and SS, so SS began pouring water into AP's shot glass, vice alcohol, when she would lose a hand. The midshipmen testified that at some point, they went back to the appellant's bedroom where he had sex with both of them on his bed. SS testified that she was very intoxicated and does not recall actually having sexual intercourse with the appellant, but remembered being led into the appellant's bedroom, lying on the bed naked with the appellant and AP, and observing the appellant on top of AP. SS testified that a few days later the appellant told her that he had sex with both SS and AP. AP testified that she saw the appellant on top of SS, and then on top of her, having sex with her. AP claimed she was substantially incapacitated, and did not consent to the sexual intercourse. Afterwards, AP vomited in the bathroom, took a shower, and then the two midshipmen left the appellant's home.

According to SS, she last had sex with the appellant at his home about May 2011, to "christen" her as an ensign, upon her graduation from the Academy in May 2011.[8] In January 2012, AP divulged to the Rifle Team Coach that the appellant had sexually assaulted her approximately eight

---

[5] The Naval Academy participates in an annual "Annapolis Cup Croquet Match" against St. John's College. The match has been described as: "An annual rite of spring, the Annapolis Cup brings together two starkly different schools—St John's College and the U.S. Naval Academy—for a croquet match like no other. The community-wide event attracts several thousand people to the heart of Annapolis for a festive lawn party complete with outrageous costumes, old-fashioned picnics, swing dancing, and, of course, croquet competition." ANNAPOLIS CUP CROQUET MATCH, https://www.sjc.edu/annapolis/events/croquet (last visited 6 June 2017).

[6] Record at 827.

[7] *Id.* at 572.

[8] *Id.* at 883.

months earlier.[9] The appellant's relationship with SS came to light in the ensuing investigation.

In September 2011—five months after the incident at the appellant's home—AP sought medical attention for a disease. Over a year later, she speculated to a friend that the appellant may have given her this disease. The defense filed a pretrial motion, pursuant to MILITARY RULE OF EVIDENCE 412(b)(1)(C), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MIL R. EVID.), seeking admission of both the statement and AP's medical record. The defense sought the evidence to impeach AP's Article 32, UCMJ, hearing testimony, in which she stated she had not sought medical attention of any kind related to the alleged sexual assault, and to attack her credibility for allegedly spreading a false rumor against the appellant. The military judge conducted a MIL. R. EVID. 412 closed-session hearing, reviewed AP's medical records *in camera*, and did not allow admission of AP's medical record, or cross-examination into the matter.

At trial, SS admitted, during cross-examination, that she told a friend, JM, about her threesome with the appellant and another man. Trial defense counsel then asked SS: "[D]id you tell somebody that after the croquet match you went over to somebody's house with another Midshipman and you had sex with two men at the same time? Do you recall telling somebody that?"[10] SS answered, "No, I do not."[11] In their case-in-chief, the defense called JM to question her about what SS had told her regarding a threesome with two men. The government objected under MIL. R. EVID. 613(b), claiming this to be improper impeachment. The judge held a hearing outside the presence of the members, in which JM testified that SS had told her about having a threesome with two men and that SS was worried about a friend who had been really drunk when they had played strip poker. The following exchange between the trial defense counsel and JM occurred:

> Q. . . . so this is after the croquet match, a couple of days later, she starts telling you a story—
>
> A. Um-hum
>
> Q. –about having a—sex with two men?
>
> A. Yes.
>
> Q. And another Midshipman being present?

---

[9] The appellant was acquitted of sexually assaulting AP while she was substantially incapacitated.

[10] Record at 884.

[11] *Id.*

A. I don't know if the Midshipman was present for the sexual activity. . .[12]

The military judge found that SS had not denied telling a friend that after the croquet match she had sex with two men, and that JM could not tie the conversation regarding a threesome with SS and two men to the night in question. Therefore, he denied the appellant the opportunity to present JM's testimony on this regard. The trial defense counsel then stated his intention to re-call SS to establish the inconsistency to the military judge's satisfaction, but ultimately chose not to do so.

## II. DISCUSSION

### A. Preclusion of prior inconsistent statement and false allegation by AP

We review the military judge's ruling to exclude evidence pursuant to MIL. R. EVID. 412 for an abuse of discretion. *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). We review the findings of fact under a clearly erroneous standard and the conclusions of law *de novo. Id.* The abuse of discretion standard "recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citations and internal quotation marks omitted). Likewise, "[t]rial rulings limiting cross-examination are reviewed for abuse of discretion." *United States v. Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005), (citing *United States v. Shaffer*, 46 M.J. 94, 98 (C.A.A.F. 1997) (additional citation omitted)).

MIL. R. EVID. 412 prohibits evidence offered by the appellant to prove an alleged victim's sexual predispositions, or that she engaged in other sexual behavior, except in limited contexts. MIL. R. EVID. 412(a), (b). "The rule 'is intended to shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].'" *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (quoting *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (alteration in original) (additional citation omitted)). There are three exceptions to the rule, the third of which is in contention here—evidence is admissible if "the exclusion of . . . [that evidence] would violate the constitutional rights of the accused." MIL. R. EVID. 412(b)(1)(C).

Before admitting this type of evidence, however, the military judge must conduct a balancing test as outlined in MIL. R. EVID. 412(c)(3) and clarified by *Gaddis*. The test is whether the evidence is "relevant, material, and [if] the

---

[12] *Id.* at 1206.

probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock*, 70 M.J. at 318 (citation omitted). Relevant evidence is any evidence that has "any tendency to make a fact more or less probable than it would be without the evidence[.]" MIL. R. EVID. 401, SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Evidence is material if it is "of consequence to the determination of appellant's guilt[.]" *United States v. Dorsey*, 16 M.J. 1, 6 (C.M.A. 1983) (citations and internal quotation marks omitted). "Those dangers [of unfair prejudice] include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Ellerbrock,* 70 M.J. at 319 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The party intending to admit evidence under MIL. R. EVID. 412(c)(3) has the burden of proving the evidence is admissible under the rule. *United States v. Banker*, 60 M.J. 216, 223 (C.A.A.F. 2004).

We find the military judge did not abuse his discretion by limiting the cross-examination of AP and prohibiting admission of her medical record. First, the military judged found that there was no false allegation when he concluded that "[t]here [was] no evidence before the court of [AP] saying she contracted [the disease] from the accused."[13] Second, the military judge found no inconsistent statement because when AP sought medical care for a medical condition in the fall of 2011, she "d[id]n't know [it was] related to this incident," but surmised a year later, in 2012, it *might* have been from the appellant "by process of elimination."[14] Therefore, there was no prior inconsistent statement with her testimony from the Article 32, UCMJ, proceeding—that she had not sought any medical attention specifically as a result of the incident—for the defense to impeach.

The military judge then conducted the proper balancing test, under MIL. R. EVID. 412(c)(3), finding that the proffered evidence was irrelevant (and therefore not material), not constitutionally required, and that its probative value was outweighed by the danger of unfair prejudice. The military judge's findings of fact were not clearly erroneous and he did not abuse his discretion in finding that the statement by AP to her teammate and AP's medical record were irrelevant and not constitutionally required. Assuming, *arguendo*, there is any relevance to the evidence, this evidence was only "marginally relevant," *Ellerbrock*, 70 M.J. at 319, and its probative value was outweighed by the danger of unfair prejudice. MIL. R. EVID. 403.

The appellant asserts that he was denied his right to confront the witness against him. "A defendant's Sixth Amendment right to confront [a] witness[]

---

[13] *Id*. at 81.

[14] *Id*. at 61.

against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry." *Israel*, 60 M.J. at 488 (citation omitted). But that inquiry must be relevant and, here, the military judge deemed it irrelevant.

The appellant's reliance on the case of *United States v. Jasper*, 72 M.J. 276 (C.A.A.F. 2013), is inapposite. In *Jasper*, the defense counsel was forbidden from inquiring into the victim's motive to fabricate. The victim had told her pastor that she had made up earlier allegations to get attention, and the court found that the statement was constitutionally required because the fact that "she had made up some or all of the allegations to get attention might cause members to have a significantly different view of her credibility." *Id.* at 281.

The appellant's case is distinguishable. The trial defense counsel was focused on whether the statement was a prior inconsistent statement—and it was deemed by the military judge to not be. Further, speculation by a friend that AP had been referring to the appellant as a possible source of a medical condition 18 months after the incident does very little to advance the claim of fabrication or bias by AP. Although AP's credibility was at issue, her belief that she had acquired a disease from the appellant was an ancillary issue. We agree with the military judge, who deemed this evidence irrelevant, immaterial, and that any probative value it might have had was outweighed by the danger of unfair prejudice and confusion of the issues.

**B. Excluding evidence of SS's prior inconsistent statements**

We review a decision to exclude evidence for an abuse of discretion. *United States v. Harrow*, 65 M.J. 190, 199 (C.A.A.F. 2007).

SS admitted to having a threesome—with two men—during cross-examination. But when asked by the trial defense counsel—in a compound question—whether she *recalled* telling someone that her threesome was the same night as the croquet match, she stated she did not recall that. The defense never clarified their compound question and SS's response answered the last question posed to her—that she did not *recall* telling a friend about the threesome. An inability to remember can qualify as an inconsistent statement. "[W]hether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position." *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993) (citing *United States v. Dennis*, 625 F.2d. 782 (8th Cir. 1980) and *United States v. Rodgers*, 549 F.2d, 490 (8th Cir. 1976)). "A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements . . . ." *Rodgers,* 549 F.2d at 496.

But an inability to recall, if believed, is not an inconsistent statement. A military judge has considerable discretion to determine whether an inconsistency exists between a witness's trial testimony and a prior statement, and to determine both admissibility and use of prior statements. *Harrow*, 65 M.J. at 200 (citing *Damatta-Olivera*, 37 M.J. at 478) (additional citation omitted)); *see also United States v. Nickens*, No. 201500142, 2016 CCA LEXIS 204, at *15, unpublished op. (N-M. Ct. Crim. App. 31 Mar 2016), *aff'd on other grounds,* 76 M.J. 126 (C.A.A.F. 2017) (summary disposition).

First, the military judge found that SS did not deny telling a friend, sometime after the croquet match, that she had had sex with two men. Rather, when asked specifically if she *recalled* telling "somebody" that "after the croquet match [she] went over to somebody's house with another Midshipman and . . . had sex with two men at the same time[,]" SS answered, "[n]o, I do not."[15] Consequently, the military judge denied the appellant's request to question JM regarding statements purportedly made to her by SS. The trial defense counsel then stated his intention to re-call SS to seek to establish the inconsistency for the military judge, but never recalled her.

Second, and more importantly, there must be a true inconsistency between SS's testimony and her recitation to JM regarding a threesome with two men for the evidence to be admitted under MIL. R. EVID. 613. The inconsistency "must appear 'prima facie' before the impeaching declaration can be introduced. . . . [T]his inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or effect* of what has been said or done." *Damatta-Olivera*, 37 M.J. at 477-78 (citation and internal quotation marks omitted).

The defense theory of admissibility was that SS told JM that on the night of the croquet match she had a threesome with two men. But, when the defense attempted to tie SS's comments about a threesome with two men to the night of the croquet match, JM testified only that she "assum[ed]" they were the same date, and that SS "never once mentioned that [the threesome with the two men] was, in fact, th[e] weekend [of the croquet match]."[16] Additionally, JM testified that she "d[id]n't know if the [m]idshipman was present for the sexual activity," and didn't even know her name.[17] The military judge did not abuse his discretion by failing to permit this impeachment under MIL. R. EVID. 613.

---

[15] *Id*. at 884.

[16] *Id*. at 1205.

[17] *Id*. at 1205-06.

Even if we assumed the military judge erred, we find that error would be harmless. "A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Art. 59(a), UCMJ. "Applying nonconstitutional harmless error analysis, we conduct a *de novo* review to determine whether this error had a substantial influence on the members' verdict in the context of the entire case." *Harrow*, 65 M.J. at 200 (citations omitted). "The test for nonconstitutional evidentiary error is whether the error had a substantial influence on the findings. . . . Importantly, it is the Government that bears the burden of demonstrating that the admission of erroneous evidence is harmless." *United States v. Flesher*, 73 M.J. 303, 318 (C.A.A.F. 2014) (citations and internal quotation marks omitted). We weigh four factors to determine whether the government has carried its burden: "(1) the strength of the Government's case; (2) the strength of the defense's case; (3) the materiality of the evidence in question; and, (4) the quality of the evidence in question." *Id.* (citation omitted).

In applying this four-part test we find the government's case was strong. Both midshipmen corroborated each other's testimony in their recitation of the events of that night. Additionally, their testimony was "corroborated in part by other witnesses, receipts, phone logs, and the pretext phone call [from SS to the appellant]."[18]

Second, the evidence supporting the defense's case was relatively weak. Although a key part of the defense's strategy was discrediting SS, the defense had plenty of other evidence of SS's character for untruthfulness. The defense presented evidence that SS had been involved in another case of fraternization after leaving the Academy, had lied about it, and that she had made other prior inconsistent statements. Additionally, they presented opinion evidence that SS had a character for untruthfulness. An inconsistent statement to JM would have added little to the defense's efforts to discredit SS.

Third, the materiality of the potentially prior inconsistent statement was minimal. As mentioned, this evidence was largely superfluous; the members had other evidence which attacked the credibility of SS, making the omission of any comment made to JM largely irrelevant.

Finally, the quality of the evidence was, at best, questionable. As discussed, *supra*, the evidence did not impeach SS's statement that she could not remember talking to a friend about the subject, and JM was unable to

---

[18] Appellee's Brief of 15 Dec 2016 at 31; Record at 923, 932, 940, 991; Prosecution Exhibits 5, 9, 10.

definitively match up different pieces of a conversation with SS regarding a threesome with two males and the taking care of a drunken friend.

Considering the four factors together, we conclude that if it was error to limit impeachment based on SS's potential prior statement, this did not have a substantial influence on the verdict. Accordingly, any error is harmless.

## C. Failing to eradicate apparent unlawful command influence[19]

The appellant argues that the military judge erred in finding that the facts establishing apparent unlawful command influence did not have a logical connection to the appellant's court-martial. Even assuming, *arguendo*, this is correct, we nevertheless find the remedies provided by the military judge—under the rubric of pretrial publicity—sufficiently protected the proceedings against any possible unlawful command influence.

### 1. The claim of apparent unlawful command influence

At trial, and on appeal, the appellant argues that his trial was infected by apparent unlawful command influence because: (1) the Commandant of the Marine Corps (CMC) made inappropriate comments regarding the guilt of those accused of sexual assault, in April 2012, during a series of lectures known as the "Heritage Brief, which he gave at various Marine Corps installations;" (2) President Obama made comments regarding holding people accused of sexual assault accountable; (3) the Secretary of the Navy, Ray Mabus, made comments regarding the Naval Academy failing to hold persons who commit sexual assault accountable; (4) the Superintendent of the Naval Academy, Vice Admiral Michael Miller, made a comment that he felt a "call to action" in dealing with sexual assault cases; and (5) there was substantial pretrial publicity surrounding the appellant's case. We discuss each in turn.

In response to public and congressional pressure regarding sexual assaults in the military, in the summer of 2012 the CMC began a series of speeches at Marine Corps installations throughout the world. "During these speeches and events, the CMC chastised Marine Corps commanders for not referring sexual assault cases to trial, and criticized Marine Officers and Staff Non-Commissioned Officers for not discharging Marines at courts-martial and administrative hearings."[20]

---

[19] This AOE was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[20] Appellant's Brief of 14 Nov 2016 at 3-4; Record at 189-90, Appellate Exhibit (AE) XIII, Attachments 1, 11. For a detailed review of the CMC's Heritage Tour, *see United States v. Easterly*, No. 201300067, 2014 CCA LEXIS 40, unpublished op. (N-M. Ct. Crim. App. 31 Jan 2014); *United States v. Howell*, No. 201200264, 2014 CCA LEXIS 321, unpublished op. (N-M. Ct. Crim. App. 22 May 2014).

On 7 May 2013, just three weeks before the appellant's trial, President Obama, in speaking to reporters, and referring to sexual assaults, stated: "The bottom line is, I have no tolerance for this. . . . If we find out somebody's engaging in this stuff, they've got to be held accountable, prosecuted, stripped of their positions, court-martialed, fired, dishonorably discharged—period."[21]

Secretary Mabus criticized the Navy's handling of sexual assault cases when he visited the Academy shortly after the appellant was charged. In commenting on the rise of sexual assaults at the military academies, he stated, "I went to the Academy. I had the whole brigade there . . . [w]e have failed at the Naval Academy in terms of preventing this. . . . It is shameful that we have one sexual assault occur. . . . This is an attack on your shipmate."[22]

Prior to the appellant's trial, Vice Admiral Michael Miller, the Superintendent of the Naval Academy and CA of the appellant's case, made a comment that he felt a "call to action" in dealing with sexual assault cases.[23] Lastly, all parties to the trial readily acknowledged that there was substantial pretrial publicity surrounding the appellant's case.[24]

### 2. The law

This court reviews a military judge's ruling on unlawful command influence *de novo. United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006); *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999); *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994). We review the military judge's

---

[21] AE XIII, Attachment 27; Record at 190. The appellate defense counsel also notes, in his brief, that four days before the appellant's trial, President Obama gave the commencement speech at the Naval Academy where he "took note of the recent cases in which service members have been charged with sexual assault. . . . [H]e said [those people] 'threaten the trust and discipline which makes our military strong.'" Appellant's Brief of 14 Nov 2016 at 6 (quoting Michael D. Shear, *Obama Calls for 'Moral Courage' at Naval Academy Graduation*, N.Y. TIMES, May 24, 2013, at A11). This quote was not part of the record of trial because the unlawful command influence motion was argued and decided on Thursday, 23 May 2013. President Obama gave his speech to Naval Academy graduates the next day, Friday, 24 May 2013. The trial with the members began on Tuesday, 28 May 2013.

[22] Michael Hoffman, *SecNav: Navy "Failed' to Protect Midshipmen*, MILITARY.COM, (Jan. 17, 2013), http://www.military.com/daily-news/2013/01/17/secnav-navy-failed-to-protect-midshipmen.html; Appellant's Brief of 14 Nov 2016 at 5; Record at 197-200; AE XV, Enclosure 5.

[23] Michael Hoffman, *SecNav: Navy "Failed' to Protect Midshipmen*, Military.com, (Jan. 17, 2013), http://www.military.com/daily-news/2013/01/17/secnav-navy-failed-to-protect-midshipmen.html.

[24] Record at 200-01.

findings of fact in conjunction with the appellant's claim under a clearly erroneous standard. *Wallace*, 39 M.J. at 286. We review a military judge's remedy for unlawful command influence for an abuse of discretion. *United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010); *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

Unlawful command influence has often been referred to as "'the mortal enemy of military justice.'" *Gore*, 60 M.J. at 178 (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)). Article 37(a), UCMJ, states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." "Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with 'eliminating even the appearance of unlawful command influence at courts-martial.'" *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)). A military judge has the inherent authority to intervene and protect the court-martial from the effects of apparent unlawful command influence because the mere appearance of unlawful command influence may be "'as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000) (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)). "[O]nce unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002) (quoting *Rosser*, 6 M.J. at 271).

The appellant alleges *apparent* unlawful command influence. The Court of Appeals for the Armed Forces (CAAF) recently stated that "unlike actual unlawful command influence where prejudice to the accused is required, no such showing is required for a meritorious claim of an appearance of unlawful command influence[,]" because "the prejudice involved in the latter instance is the damage to the public's perception of the fairness of the military justice system as a whole and not the prejudice of the individual accused." *United States v. Boyce*, __ M.J. __, No. 16-0546, 2017 CAAF LEXIS 494, at *14 (C.A.A.F. May 22, 2017).

In *Boyce*, the CAAF provided the legal test for assessing claims of apparent unlawful command influence:

> The appellant initially must show 'some evidence' that unlawful command influence occurred. . . . This burden on the

defense is low, but the evidence presented must consist of more than 'mere allegation or speculation. . . .'

[T]he burden then shifts to the government to rebut the allegation. Specifically, the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence. . . . If the government meets its burden, the appellant's claim of unlawful command influence will be deemed to be without merit and no further analysis will be conducted. . . .

If the government does not meet its burden of rebutting the allegation at this initial stage, then the government may next seek to prove beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would [*not*] harbor a significant doubt about the fairness of the proceeding. . . . If the government meets its evidentiary burden at this stage of the analysis, then the appellant merits no relief on the grounds that there was an appearance of unlawful command influence.

*Id*. at *11-12 (citations and internal quotation marks omitted).

*3. The military judge's ruling*

The defense focused solely on the appearance of unlawful command influence, but the military judge determined that there was neither actual nor apparent unlawful command influence. He deemed the evidence presented by the defense, in support of their motion, had no logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings, and viewed the issue as one of pretrial publicity. He agreed that the defense had "shown lots of extensive pretrial publicity with regards to the issue of sexual assault in the military," but they had failed in specifically linking unlawful command influence to the appellant's case.[25]

The military judge ruled:

[T]here's no . . . appearance or—that this—this chain of command has been influenced—or this Convening Authority has been influenced improperly. That said, you're going to have an opportunity to extensively voir dire with regards to pretrial

---

[25] *Id*. at 193.

publicity of this issue when you conduct your voir dire. . . . [T]he court's analysis and the defense's argument has been on the appearance. If there is appearance of that, the court believes it has cured that as well by the additional peremptory challenges, totaling three, and allowing the extensive voir dire.

But the court views this as an issue of high pretrial publicity . . . . [T]he defense has failed to show that there has (sic) been any acts directed towards this case that would constitute unlawful command influence, thus I've not shifted the burden to the government.

And, again, the issue here really isn't the second prong of *Biagase* that I'm concerned about, it's the pretrial publicity . . . .[26]

In order to ameliorate any adverse effects of pretrial publicity in the appellant's case, the military judge ordered the defense team to "have a line of pretrial publicity questions laid out for [him] by 1300 [the next day]."[27]

*4. No actual or apparent unlawful command influence*

Although the appellant at trial, and on appeal, focuses only on the issue of apparent unlawful command influence, our review on appeal must necessarily consider whether actual or apparent unlawful command influence tainted the appellant's trial. *United States v. Simpson*, 58 M.J. 368, 374, 377 (C.A.A.F. 2003); *Stoneman*, 57 M.J. at 42-43.

The appellant does not contend, and we do not find, any evidence of actual unlawful command influence. We have found nothing in the record to suggest that the Heritage Brief given by the CMC, or comments made by President Obama, or Secretary Mabus, or Admiral Miller, improperly influenced either the CA, staff judge advocate, or anyone else associated with the appellant's trial, to include the members. The defense was permitted extensive voir dire of the members; individual voir dire comprising nearly 200 transcribed pages in the record of trial.[28] The military judge was also quite active in the voir dire process, and ensured the members were carefully vetted. He paid particular attention to whether any member had been exposed to pretrial publicity about the case, or held biased opinions against persons accused of sexual assault. The defense was also granted two additional peremptory challenges—bringing the total number of peremptory challenges available to

---

[26] *Id*. at 219-21.

[27] *Id*. at 201.

[28] *Id*. at 290-504.

the defense to three. The military judge only granted two of the four defense challenges for cause, but the defense was able to use their two additional peremptory challenges to remove the two members unsuccessfully challenged; every member the defense challenged was removed from the appellant's panel.[29]

We also find no apparent unlawful command influence. Specifically, the appellant was acquitted of the sexual assault which formed the basis of the apparent unlawful command influence claims at trial. It is a tenuous position to argue on appeal that the members were unduly influenced against the appellant due to pressure to convict servicemembers of sexual assault, when the appellant was acquitted of this offense. Additionally, although the military judge refused to rule out the possibility of the appellant receiving a dismissal as a remedy, the members did not award one.

In applying the *Boyce* test, we do not agree with the appellant's assertion that statements made by certain leaders—to hold those who commit sexual assaults accountable—amounts to "some evidence" that unlawful command influence occurred. However, even assuming, *arguendo*, that some evidence that unlawful command influence occurred was presented, we find that the government proved that the facts proffered by the appellant did not constitute unlawful command influence. Assuming, further, that the government did not meet its burden of rebutting the allegation at the initial stage, we find that the government proved, beyond a reasonable doubt, that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding. Therefore, the appellant merits no relief on the grounds that there was the appearance of unlawful command influence.

The military judge made it clear he would remain engaged on the issue of pretrial publicity throughout the proceedings and would take all necessary steps to ensure the appellant received a fair trial. He did so. He specifically asked the defense, "[I]f I don't find that in this chain of command that there's UCI, what do you want the court to do to ensure that the public looking at this case says he received a fair trial and a fair panel?"[30] Then, as discussed *supra*, he gave the defense two of their three desired remedies—expanded voir dire and extra peremptory challenges. Whether the remedies the military judge awarded were under the rubric of unlawful command influence or pretrial publicity, we find no abuse of discretion.

---

[29] *Id.* at 507, 525.

[30] *Id.* at 191.

In sum, in assessing apparent unlawful command influence, "[w]e focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public. Thus, the appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Lewis*, 63 M.J. at 415.

Applying this test, we are convinced beyond a reasonable doubt that a reasonable member of the public would not harbor significant doubts as to the fairness of the appellant's proceedings, and that his case was not tainted by unlawful command influence.

### III. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed.

Chief Judge GLASER-ALLEN and Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court