# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 24069**

———————————

**UNITED STATES**
*Appellee*

v.

**Sascha D. REESE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 18 June 2026[2]

———————————

*Military Judge*: Sterling C. Pendleton.

*Sentence*: Sentence adjudged 18 April 2024 by SpCM convened at Spangdahlem Air Base, Germany. Sentence entered by military judge on 23 May 2024: 90 days hard labor without confinement and reduction to E-3.

*For Appellant*: Major Jordan L. Grande, USAF (argued); Dwight H. Sullivan, Esquire.

*For Appellee*: Major Kate E. Lee, USAF (argued); Matthew D. Talcott, Colonel, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Regina Henenlotter, USAF; Mary Ellen Payne, Esquire.

———————————

[1] Appellant appeals her conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A). *See Manual for Courts-Martial*, *United States* (2024 ed.).

[2] The court heard oral argument in this case on 27 February 2026 at Syracuse University College of Law, Syracuse, New York, as part of the court's outreach program. We are extremely appreciative of the law school graciously hosting and organizing this event and especially want to thank Professor Elizabeth G. Kubala and Professor Todd A. Berger, the supervising attorneys, and students for making this Air Force program such a success.

*Amicus Curiae for Appellant*: Bess Murad (law student, argued); Alyssa S. Kim (law student); Madison E. Mahar (law student); Thomas M. Leith, Esquire—Syracuse University College of Law, Syracuse, New York.

*Amicus Curiae for Appellee*: Nathan Orner (law student, argued); Ava M. Dussmann (law student); Hannah A. Rice (law student); Piotr Banasiak, Esquire—Banasiak Law Office, PLLC, Syracuse, New York.[3]

Before GRUEN, KEARLEY, and MORGAN, *Appellate Military Judges*.

Judge MORGAN delivered the opinion of the court, in which Senior Judge GRUEN and Judge KEARLEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MORGAN, Judge:

Appellant was found guilty, contrary to her pleas, by a panel of officer and enlisted members, of one specification of reckless operation of a vehicle in violation of Article 113, UCMJ, 10 U.S.C. § 913. Consistent with her pleas, Appellant was acquitted of two specifications of obstruction of justice in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.[4] The members sentenced Appellant to 90 days hard labor without confinement and reduction to the paygrade of E-3. The convening authority took no action on the findings or sentence.

Appellant asserts five assignments of error, which we have re-phrased: (1) whether the Government conflated separate theories of criminal liability rendering the finding of guilty for reckless driving legally and factually insufficient; (2) whether the finding of guilty for reckless driving "by crossing into the opposing lane of traffic" was factually sufficient; (3) whether the finding of guilty for reckless driving was supported by legally and factually sufficient evidence of Appellant's culpable negligence; (4) whether the military judge erred in ruling that evidence, withheld by the Government, concerning ongoing civil litigation involving the driver of the other vehicle involved in the collision, was not favorable or material to Appellant's case; and (5) whether the military

---

[3] Both supervising attorneys for *amicus curiae* students representing Appellant and Appellee were properly admitted *pro hac vice* to practice before this court.

[4] Unless otherwise noted, all references in this opinion to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

judge abused his discretion by allowing the Government to present evidence of Appellant's driving record to prove "malice aforethought" when reckless driving requires no specific intent.[5]

We do not address issues (1)–(3) and (5) because we find that the military judge erred in ruling that evidence withheld by the Government, concerning ongoing civil litigation involving the driver of the vehicle with whom Appellant collided, was not favorable or material to Appellant's case, and therefore, set aside the findings of guilty to the sole Specification of Charge I and the sentence, and authorize a rehearing.[6]

## I. BACKGROUND

At approximately 0300 on 21 May 2023, Appellant collided head-on with another vehicle near Lohnweiler, Germany. Appellant was driving alone in her BMW X3 from Lauterecken to Kaiserslautern when she collided with a Toyota Corolla (Toyota) traveling in the opposite direction. There was a slight curve in the road. EE, a German National, was driving the Toyota transporting his wife AE, and another couple, LJ and JS.

On-scene German police requested both drivers submit to a portable breath test (PBT). After Appellant's first attempt, she complained she did not feel well and could not complete the test. Another on-scene officer observed Appellant struggling to take the PBT and attempted to assist. This officer perceived a "sweet smell" mixed with an alcohol scent coming from Appellant. Upon further attempt to submit to the PBT, Appellant suffered a panic attack and received a medical check from on-scene medical providers who also provided her

---

[5] On 15 January 2026, we ordered oral argument on the following issues:

I.

WHETHER THE FINDING OF GUILTY FOR RECKLESS DRIVING WAS ESTABLISHED BY FACTUALLY SUFFICIENT EVIDENCE THAT APPELLANT CROSSED INTO THE OPPOSING TRAFFIC LANE AND THAT THE SPEED FOR WHICH SHE DROVE HER VEHICLE OR BLOOD ALCOHOL CONTENT (BAC) WAS THE PROXIMATE CAUSE OF THE INJURY.

II.

WHETHER THE MILITARY JUDGE ERRED IN RULING THAT WITHHELD EVIDENCE ABOUT THE ONGOING CIVIL LITIGATION INVOLVING EE, THE OTHER DRIVER, WAS NOT MATERIAL NOR FAVORABLE TO THE FACT FINDING IN APPELLANT'S CASE.

[6] We also note this opinion is issued more than 18 months after Appellant's case was docketed with this court, which constitutes a facially unreasonable delay. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because we set aside the findings and sentence, we find it unnecessary to further address this issue in this opinion.

with a water bottle with which she proceeded to wash out her mouth. Asked by police if she had consumed any alcohol, Appellant replied "[N]o alcohol" and "[N]aproxen" and "pointed towards her throat." Appellant ultimately provided a successful PBT sample that registered 0.032% blood alcohol content (BAC). Appellant also provided an on-site blood sample at 0355 hours that later returned a BAC of 0.04%. EE's PBT indicated zero presence of alcohol concentration. He testified at trial that he did not consume any alcohol the night of the collision.

The area of impact was disputed at trial and could not be precisely determined by experts for either party, principally because German police did not consider the crash a crime and thus did not preserve the scene. Neither of the parties' respective accident reconstructionist experts could conclude which driver entered the others' lane, or who caused the collision.

The findings portion of Appellant's court-martial began on 18 March 2024. The specification at issue in the case alleged Appellant

> did, at or near Lohnweiler, Germany, on or about 21 May 2023, on the B270 between Lohnweiler and Heinzenhausen physically control a vehicle, to wit: a passenger car, in a reckless manner by crossing into the opposing lane of traffic while going around a curve on a two-lane road and did thereby cause said vehicle to strike and injure [EE], [JS], [LJ], and [AE].

## A. Testimony of Government Witnesses

### 1. EE's Testimony

EE testified that on the night of the collision, he and his wife, AE, and another couple, LJ and JS, were returning home from an evening spent at a nightclub in Kaiserslautern. EE testified he did not consume alcohol that evening, but that his passengers had done so. He testified, "[T]here was a right curve and I was not able to see what was behind that curve because there is a heightened bicycle lane. But after the curve, I saw a car moving towards me. So I realized very fast the car was on my lane." He clarified he did not know to what extent the other vehicle was on his lane. He also testified he did not have time to avoid the collision and his next memory was waking up after he was knocked out by the collision. He sustained injuries to his skull, hips, and tore a muscle in his back.

### 2. AE, EE's Spouse

AE was riding in the backseat of the Toyota. She had no memory of the event. Her injuries included a broken arm, lumbar vertebrae fracture, hiatal hernia and an abdominal wall hernia, causing her internal organs to move towards her lungs resulting in the partial removal of the small and large bowels.

She also had internal damage to her kidneys, liver, spleen, and diaphragm. She was hospitalized for three to four weeks.

### 3. LJ, AE's Female Cousin

LJ, AE's cousin, was also riding in the backseat of the Toyota. LJ testified that EE offered to drive them because he was the most familiar with the area. Before the collision, she remembered a man saying, "[S]hit where did she come from?" She was rendered unconscious by the crash and awoke to her boyfriend, JS, checking her pulse. Her injuries included a torn liver, burst bowels, and necessitated removal of her gallbladder. Additionally, she had a torn kidney, suffered a lung contusion, an abdominal wall hernia, a torn abdominal muscle shield, four rib fractures, a broken third lumbar vertebra, and an open wound on her left hip. She spent 12 days in the intensive care unit and six weeks in the hospital. She underwent 15 surgical operations and suffers from lifelong medical issues.

### 4. JS, LJ's Boyfriend

LJ's boyfriend, JS, was riding in the front passenger seat of the Toyota. He testified he had consumed a mixed beer beverage before leaving for the nightclub and then no more than four cocktails at the nightclub. He testified he "recognized headlights on [their] lane" before the impact but did not remember evasive maneuvering from EE. He had no memory of the impact but remembered seeing a deployed airbag in front of him and a destroyed windshield. He spent six hours in the emergency room and two to three days in the hospital. His injuries included bruises and contusions to his hip and upper leg.

### 5. Dr. JW, Forensic Toxicologist

The Government called Dr. JW, a forensic toxicologist, who testified generally on the effects of alcohol consumption. Dr. JW testified as a result of alcohol consumption brain "nerve cell[s] don't fire as well as they used to;" alcohol "affects motor skull function," has "sedative qualities," and can lead to "impulsive" behavior depending on a person's BAC. He testified that depending on when an individual last consumed alcohol, their BAC level could have previously been higher than what was reported on the chemical test, but he would "have to have a lot more information" to estimate Appellant's BAC at the time of the collision. He also testified that at Appellant's reported BAC result, there could be impairment of one's reaction time, perception of time, distance, and speed. He stated that no matter the BAC level "there's always some contribution" to impairment.

### 6. Mr. FH, Traffic Accident Reconstructionist

The Government then called Mr. FH, a German national and traffic accident reconstructionist, who testified his "main work is accident reconstruction

for police, for courts, and for [the] public prosecution office." However, he was not a public certified accident reconstructionist.[7] Several months after the collision, Mr. FH examined both vehicles, "the location of the accident," and photos from the crash site in the police report. He collected driving data from both vehicles' Event Data Recorders (EDR), which he described as "a kind of storage function in the airbag devices." He concluded, "According to my data or my perspective, the collision must have occurred in the middle of the road, slightly on the side of [EE's] lane." With respect to the position of Appellant's vehicle at the time of the collision, he further opined, "It was in the middle of the road and partially tilting towards the left[-]hand side on [EE's] lane." With respect to the location of EE's vehicle at the time of impact, he also testified during direct examination that he "cannot exclude that at the moment of the collision part of [EE's] vehicle [was] also on [Appellant's] lane."

He testified the EDRs from both vehicles recorded driving data for the five seconds before the collision, though not necessarily synchronized between the two vehicles. The data, according to Mr. FH, reflected that 4.6 seconds before the collision, EE's vehicle was traveling at approximately 80 to 84 kilometers per hour in a 100 kilometers per hour speed zone; however, "just in the area of the accident it changed to 70 kilometers per hour." He stated 1.6 seconds before the crash, EE's vehicle was accelerating and brakes were applied 0.6 seconds before the collision. The data showed EE was traveling at 58 kilometers per hour at the time of the collision. The steering data showed EE's vehicle steered strongly to the left just before the collision, possibly in an attempt to avoid the collision.

Mr. FH also testified that the data stored in the EDR in Appellant's vehicle showed she was traveling at approximately 99 kilometers per hour five seconds before the collision. The speed limit in her direction was 70 kilometers per hour. One half second before the crash, Appellant's vehicle also steered strongly to the left. Appellant applied her brakes immediately before or during the collision and was traveling at between 90 and 100 kilometers per hour at the time of impact. He also testified that while Appellant's vehicle was traveling 25 to 30 kilometers per hour over the speed limit, her speed was "as a cause, technically not significantly because there was a curve and a speed and I cannot – I don't have evidence to assume that the curve speed was extended."

During cross-examination, Mr. FH testified, "I cannot determine whose fault this was," and that "[he] also cannot conclusively determine the cause of the accident." He reiterated that speed was "no significant factor" in the

---

[7] While recognized by the court as an expert, Mr. FH also testified on cross-examination that he does not have "a public certification" as an accident reconstructionist.

collision. He stated the evidence secured by the police "could have been better" and there were "no detailed photos of [any of] the scratch marks" on the road. He again confirmed he "cannot exclude that parts of [EE's] car were in the lane of [Appellant]" at the time of collision. Mr. FH testified that on the route Appellant was driving the speed limit changed five times. As to the fact that EE steered to the left before the crash, Mr. FH agreed "it's less common to evade into the opposing lane of traffic."

## B. Testimony of Defense Witnesses

### 1. Mr. MS, Accident Reconstruction Expert

Mr. MS, a German national and certified accident reconstruction expert, testified for the Defense. He too inspected the collision scene, the vehicles, the EDR data, and police evidence. He initially confirmed the police photographs of the crash site lacked the detail and quality to reconstruct what happened in this case. He stated more detailed information would make the crash site area much smaller than depicted in Mr. FH's report. He discussed his process for reconstructing an accident, stating it was possible the crash occurred "in the middle of the street" and agreed it was possible EE and Appellant could have entered each other's lanes. The EDR data reflected that both vehicles tried to avoid the crash "[a]nd if it's on the middle lane or five centimeter[s] in lane [EE] or five centimeter[s] in lane [Appellant], doesn't give us any possibility . . . to say who caused the crash."

With respect to speed, he testified theoretically a driver could drive the curved road at 182 kilometers per hour, but that a "normal driver" could drive the road at 130 kilometers per hour and "feel safe." He added that Appellant's last recorded speed was 98, however, she was 5 to 10 meters away from entering a zone where 100 kilometer per hour was permissible. He testified that both he and Mr. FH had agreed before trial that the police investigation in Appellant's case was "catastrophic" because it had such limited information. Ultimately, he was unable in his opinion to determine who was at fault for the collision.

### 2. Master Sergeant SG

Master Sergeant (MSgt) SG, Appellant's former supervisor, testified for the Defense that the night of the collision, Appellant was at a going away party at MSgt SG's home. She testified she did not observe Appellant drinking or exhibiting signs of intoxication that evening, and that Appellant agreed to be a designated driver that night though she did not end up driving anybody home. Appellant sent her a text message at 0214 to let her know she had made it home.

### 3. Technical Sergeant AT

After arriving home, Appellant decided to visit a friend and started driving to Technical Sergeant (TSgt) AT's home. Appellant was on her way to TSgt AT's home when her collision with EE occurred. TSgt AT testified she went to the collision scene when Appellant called her and shared her accident location. She testified that the German police on the scene were hostile and that she and Appellant both had difficulty understanding them.

## C. EE's Presentencing Testimony

After the panel members issued their findings verdict, the Government called EE as its first presentencing witness. He testified that he still had a financial obligation for his vehicle damaged in the collision because he had not been paid by his automobile insurance company. On cross-examination, he clarified that there was an "ongoing civil case" related to the collision. He testified that he previously told the Government that he had "commissioned a lawyer because of compensation payments for [his] car," and that the following month there would be "a trial in the [local German] court."

The military judge then held a conference with the parties, pursuant to Rule for Courts-Martial (R.C.M.) 802, which he summarized on the record at an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. He stated that during the R.C.M. 802 conference, trial defense counsel notified the military judge of a potential issue in that he and Appellant learned for the first time, during EE's cross-examination, there was a potential civil suit. Trial defense counsel added to the military judge's summary of the conference that "the [G]overnment had knowledge that an accident reconstructionist was involved in that civil hearing and made a conclusion that [EE] was involved, mainly the insurance company for [Appellant], the accident reconstructionist determined that they could not find fault based on looking at the photographs of the scene." The court then recessed until the following day to permit the Defense an opportunity to file any motions.

That evening, the Defense submitted a specific discovery request, asking for the Government notes from EE's interview, and evidence involving civil proceedings involving EE and/or Appellant. That same evening, the Government provided an unredacted portion of interview notes documenting EE's statement:

> Because his vehicle is confiscated, he is paying loans on vehicle, because confiscated, he cannot get rid of loan payments. While he still has the other loan, he is not able to purchase a new vehicle because he would need a loan for that vehicle. Insurance doesn't pay for that. Does have an attorney to coord[inate] insurance, civil matter in [G]erman court between the two insurances.

At the Article 39(a), UCMJ, hearing the following morning of 23 March 2024, trial defense counsel submitted a "Motion to Dismiss for Discovery Violation." The military judge and the parties discussed the way ahead, which resulted in the Government moving for a continuance before litigating the motion to dismiss. The military judge then granted the Government's unopposed continuance motion.

**D. Defense Motion to Dismiss for Government Discovery Violation**

When the parties re-convened on 17 April 2024, the military judge allowed the parties to present evidence on the Defense's motion to dismiss for a government discovery violation. Appellant testified for the limited purpose of the motion, that although she filed an insurance claim for the accident, she had never been notified of any pending civil litigation in the matter, and heard about it for the first time during EE's presentencing testimony.

Trial defense counsel also called its appointed translator, Ms. EH, who testified she is "an interpreter and translator, officially sworn for German courts." She testified she was present during trial defense counsel's pretrial interview of EE wherein EE made no mention of his financial obligations respecting his damaged car, or that he had an attorney and was involved in civil litigation concerning the collision.[8] She also translated the contents of an email, dated 12 March 2024, from the Major Command (MAJCOM) legal office to the prosecuting base legal office that included an attached summons for Appellant to appear in the Kaiserslautern Regional Court on 16 April 2024, regarding the collision.

Trial defense counsel also called Senior Airman (SrA) EL, the defense case paralegal, who participated in a defense interview of Mr. DF[9] that occurred the previous day. Mr. DF was a German attorney representing Appellant's insurance company in the civil case between Appellant's and EE's respective insurance carriers. SrA EL testified that the Defense was first made aware of Mr. DF's existence "from an attachment to the [G]overnment's response to the [D]efense's motion to dismiss for discovery violation." In the interview, Mr. DF stated that nobody from his litigation team ever contacted Appellant about the pending litigation, as that duty rests with the applicable German district court, not attorneys. He also stated that since 12 March 2024, the German district court had been working through the Air Force "Headquarters International

---

[8] She testified that while she could not recall the date of EE's pretrial interview, it was in the same week as Appellant's trial.

[9] Though only referred to as "Mr. F" in the transcript, appellate exhibits show his initials are DF, to whom he shall be referred as herein.

Law at Ramstein Air Base" to notify Appellant of the civil proceedings, but as of 8 April 2024, contact with Appellant was unsuccessful.

Mr. DF additionally said during the defense interview that the insurance company he represented hired a certified independent accident reconstruction expert who, following his reconstruction analysis based on photos, scatter patterns, and lab analysis, determined EE was at fault for the collision. SrA EL testified that according to Mr. DF, this expert was "very experienced" and might have been appointed by the German court, if not already hired. SrA EL confirmed Mr. DF described this expert as using "well practiced" lab analysis and "proprietary data sets." According to Mr. DF, Appellant made a statement to her insurance carrier wherein she stated, "[T]here was a curve in the road and that she was following the curve on the road, that she was met with high beams, blinded, and crashed." SrA EL also testified that according to Mr. DF, "97 to 98% of these types of incidents do not go to court . . . ."

Trial defense counsel argued in their motion that the withheld discovery impacted their ability to (1) impeach EE based on a financial motive, (2) call this third-party reconstruction expert to testify about scatter patterns and his opinion that EE caused the accident, and (3) impeach other government witnesses in the case based on their involvement in the insurance litigation. Trial defense counsel further argued that the Government engaged in "prosecutorial misconduct, not necessarily bad faith." In response to a question posed by the military judge, trial defense counsel stated the Defense did not make a specific discovery request for "potential civil litigation," but it did request material pursuant to R.C.M. 701(a)(6).

The Government, in its written response to the defense motion to dismiss, acknowledged that as of 13 March 2024, it was in fact aware of the existence of the pending civil litigation matter. The Government also attached to its motion response a filing in its possession from Mr. DF to the Kaiserslautern Regional Court, dated 27 December 2023. The Government stated in its response this filing was also sent to "[EE's] attorney" on that date.[10] This filing contains a "Claim on the Merits" section which, *inter alia*, describes the facts of the collision in this case, stating, "The witness [Appellant] was driving the B270 coming from Lauterecken . . . ," and "[i]n what the [Appellant] saw as a slight right-hand bend, in which the accident occurred, the [Appellant] was driving close to the edge of the road. The plaintiff [EE] approached her with his high beam

---

[10] EE testified he "commissioned a lawyer because of compensation payments for [his] car." The record is unclear whether this correspondence refers to EE's "commissioned" attorney as well as any attorneys for EE's insurance company. In either event, it does not change our analysis.

switched on and dazzled her. A collision then occurred." The filing then addressed causation, stating:

> From the documented track situation, in particular from the final positions of the vehicles in the splinter field, it is clear that [EE] had left his lane to the left at the time of the collision. The splinter field is located in the lane being driven in by [Appellant]. As a result of the head-on collision, [Appellant's] vehicle was thrown backwards within the lane and towards the edge of the lane or the crash barrier there. [EE's] vehicle, on the other hand, rotated approx[imately] 180 degrees and came to a standstill in the opposite lane at the level of [EE's] vehicle, but rotated almost once around its own axis. The [Appellant] no longer had the opportunity to avoid the collision.
>
> . . . .
>
> It is disputed that the [Appellant] left the lane to the left in the direction of the oncoming lane driven by [EE's[ vehicle. Rather, it was the case that [EE] steered his lane [sic] in the direction of the lane used by the [Appellant's] vehicle.
>
> . . . [EE] was solely at fault for causing the traffic accident in question by veering out of his lane and into the oncoming lane in violation of the requirement to drive on the right resulting from Section 2 (2) StVO.[11]

As "proof," for its position, the filing lists an "expert opinion." The record does not further explain when the Government came into possession of this filing.

The Government also attached an email it sent to trial defense counsel, dated 9 January 2024. That email, *inter alia*, advised the Defense that its expert, Mr. FH, discovered EE was involved in a traffic accident in 2021, and that a district court had appointed an expert, Dr. JP, to "evaluate causation of the accident." It further stated, "Mr. FH also advised that the previous accident is in no way related to the instant accident and that civil proceedings, such as the pending case in Homburg/Saar, after traffic accidents are the usual procedural [sic] in Germany." The next day, trial defense counsel responded, "Who was operating the vehicle at the time of the accident in 2021? Has [Dr. JP] completed his evaluation of that accident, and, if so, can we expect to get documents associated with that assessment?"

---

[11] According to this pleading, Section 2 (2) StVO is a German traffic law that "warns drivers to drive 'as far to the right as possible.'"

The Government argued that the evidence of civil litigation was not favorable, but merely the expected outcome of a vehicle accident resulting in damages and injuries, and that it had no obligation to disclose evidence that could potentially lead to exculpatory evidence that trial defense counsel could have discovered through due diligence. The Government further maintained the evidence was not material due to the strength of the remaining evidence presented, and any impeachment value of EE would be overcome by introduction of EE's prior consistent statements. The Government argued if there was error, the harmless beyond a reasonable doubt standard was not triggered because trial defense counsel had not made a specific discovery request for pending litigation, and there was no prosecutorial misconduct.

During argument on the motion, trial defense counsel sought to articulate the prejudicial impact of non-disclosure to the military judge wherein the following exchanges occurred:

> [Defense Counsel (DC)]: . . . I do also want to talk about the facts of the case. Because the facts of this case, as the [D]efense believes, are factually insufficient to establish that [Appellant] reckless[ly] operat[ed] the vehicle and in support of that motion . . . .
>
> [Military Judge (MJ)]: Well – okay, we already have findings in this case, correct?
>
> . . . .
>
> DC: So the reason I'm bringing this up is, it's a question of how significant this information that we didn't have would have been on trial. The whole question is this undisclosed civilian litigation –
>
> MJ: And that's fine if you want to argue had you had this information, you would have done things differently, but put [sic] to now, after findings and not using the appropriate vehicle, let's say. I'm – we're not going to relitigate the case here.
>
> DC: Not trying to relitigate –

### E. Military Judge's Ruling

The military judge denied Defense's motion to dismiss, finding as fact that the Government acknowledged that as of 13 March 2024, it was aware of civil ligation involving EE and Appellant; that as of that date, the Government was aware of a request from the German courts to serve a summons on Appellant; and that this information was not disclosed to the Defense until after the members announced findings on 22 March 2024.

The military judge further found that Appellant testified she first learned of the civil litigation after the members announced findings. He found the testimony of Ms. EH, a German translator for the Defense, credible and that during EE's interview with the Defense, he did not disclose information regarding civil litigation, and that Ms. EH had translated an email for the local district court regarding a summons for Appellant's 16 April 2024 court date.

The military judge also found SrA EL credible and that based on her participation in Mr. DF's interview, no German attorney attempted to contact Appellant regarding the civil litigation. The military judge found that Mr. DF was "not a neutral party" and that on 2 January 2024, Mr. DF "signed a document for the Regional Court in Kaiserslautern advocating a position in favor of the [Appellant's] insurance company's position (and by extension, the [Appellant's]) to that court." The military judge also found Mr. DF's "firm/insurance company hired an expert to testify for the Court," and that the "expert's conclusions based on a 'scatter pattern' was that [EE] was at fault." He found "the [D]efense altered its position" at the motion hearing to allege prosecutorial misconduct for failing to turn over evidence of the civil litigation. Based on the Government's pleadings on the motion, the military judge found that Capt JD, from the base legal office, notified trial defense counsel on 9 January 2024, that EE was currently involved in civil litigation stemming from a 2021 automobile accident, and that Capt JD informed trial defense counsel that civil proceedings following an automobile accident are "the usual procedure in Germany." He further found Capt JD provided trial defense counsel emails on 9 February 2024, between the Government's paralegal Ms. BA and the victims in this prosecution. The military judge added, "In one of those emails provided to [D]efense, [EE] referenced his vehicle claim and to an Appraiser/Expert handling it. In the same email, the Mr. (sic) BA, indicated EE was referencing a 'civil matter.'"

The military judge ruled, "Evidence of civil litigation in the [G]overnment's possession is discoverable and should have been turned over pursuant to R.C.M. 701. However, the Court finds no prosecutorial misconduct. The [D]efense had failed to demonstrate prosecutorial misconduct." He reasoned that the email provided to the Defense by Capt JD that referenced EE's inquiry about an "Appraiser/Expert" should have "alerted [D]efense to the possibility of civil litigation," and that "R.C.M. 701(a)(6) generally does not place on the [G]overnment the duty to search for exculpatory evidence held by people or entities not under the control of the [G]overnment." He reiterated, however, "Nonetheless, the [G]overnment should have quickly turned over information regarding the civil litigation that came into its possession on 13 March 2024."

The military judge determined that because trial defense counsel had not made a specific request for the information and the court did not find prosecutorial misconduct, "the appropriate test to determine prejudice was whether a reasonable probability of a different result exists that disclosure would have resulted in a different result." He ruled evidence was not favorable because "civil litigation between insurance companies involving a car collision does not evince the existence of evidence that reasonably tends to be exculpatory." Further, "the civil litigation merely reflects the common practice of competing insurance companies' attempt to reach a monetary settlement . . . ."

He also ruled evidence of the on-going civil litigation was not material because "given the current case posture," the Government's evidence was "considerable." He then summarized the Government's case:

> [Appellant] was traveling at nearly 30 km over the speed limit; she had a BAC of 0.04 and smelled of alcohol; and three victims testified to seeing bright headlights; and [EE], the driver who had no alcohol in his system, stated he never left his traffic lane. Finally, had [EE's] credibility been attacked on cross-examination regarding his economic interest in the civil litigation, the addition of this potential information would not have risen to meet the materiality standard.

The military judge further footnoted, "The Court makes this determination considering the totality of the evidence presented."

The military judge concluded that "the fact that Mr. [DF] (and associated expert) asserted [EE] was at fault in the civil case is largely consistent with the defense expert's testimony of Mr. [MS] at trial: '[EE's] vehicle could have gone into [Appellant's] lane.'"

The military judge concluded by saying, "A better discovery practice, however, would have resulted in timely disclosure of the civil litigation information in the [G]overnment's possession as of 13 March 2024 . . . . Nonetheless, there is no demonstrated prejudice, nor is there prosecutorial misconduct." He therefore found that "no relief is warranted," and "decline[d] to impose the drastic remedy of dismissal with prejudice."

### F. Appellate Arguments

#### a. Arguments for Appellant

Appellate defense counsel for Appellant and *amicus curiae* law students for Appellant argued the withheld evidence was favorable because of its exculpatory tendency to negate guilt and weaken the Government's case, and because of its impeachment value. Specifically, the withheld evidence was

favorable for two independent overall reasons: (1) it provided substantive support for an alternative theory of causation grounded in independent expert analysis, undermining EE's testimony that he never left his lane; and (2) it supplied impeachment evidence demonstrating that the Government's principal fault witness had a concrete financial motive to shift blame (*i.e.*, bias), as well as EE's passengers. Counsel for Appellant argued the "routine nature" of insurance settlements does not speak to its relevance to bias. Additionally, counsel for Appellant argued they cannot be faulted for the fact that it cannot demonstrate further favorability of evidence that they never had the chance to explore.

With respect to materiality, Appellant argues that under *Kyles v. Whitley*, 514 U.S. 419 (1995), courts ask not whether the remaining evidence could still support a conviction, *i.e.,* materiality is not a sufficiency of the evidence test, but courts ask whether disclosure could reasonably have affected how the case was tried and evaluated. Appellant further argues our superior court's decision in *United States v. Roan* implements *Kyles* by holding, "The question is not what was raised at trial, but what could have been raised had this information been disclosed." 86 M.J. 159, 164 (C.A.A.F. 2025).

Appellant argues the military judge erred in his materiality analysis because rather than asking how timely disclosure could have shaped the Defense's investigation, cross-examination, and theory of the case, the military judge assessed the suppressed evidence against a trial record already shaped by nondisclosure, and weighed it against the Government's remaining proof, transforming *Brady*[12] into a post-verdict sufficiency review.

With respect to prejudice, Appellant argues that while trial defense counsel did not make a specific request for the withheld discovery, the harmless beyond a reasonable doubt standard is applicable because the Government's withholding of the evidence constituted prosecutorial misconduct. Under that standard, Appellant argues that had he known about the third-party expert, the Defense could have called that expert to explain his findings that EE was the cause of the accident. Further, it could have challenged the Government's entire theory of how the accident occurred with a viable alternate theory that "would have made a substantial impact in a weak Government case."

Appellant further argues suppression of the evidence also undermined confidence in the verdict because the panel resolved the question of guilt without knowing that a retained reconstruction expert attributed fault to EE, who faced substantial financial consequences tied to that attribution. Further,

---

[12] *Brady v. Maryland*, 373 U.S. 83 (1963).

the Government emphasized the strength of its case at trial in the absence of concrete contradictory evidence withheld by the Government. Because the panel decided who crossed the center line without the adversarial testing that timely disclosure would have enabled, the resulting verdict cannot be trusted as a reliable determination of guilt.

### b. Argument by the Government

Conversely, the Government, through government appellate counsel and *amicus curiae* law students arguing on behalf of the Government, maintains the military judge reasonably concluded that evidence of the civil litigation was not favorable because focusing on impeachment of EE's financial motive ignores the testimony of other fact witnesses and is "offset by the Prosecution's wealth of other evidence." The Government also avers the military judge reasonably concluded that the civil litigation evidence was immaterial, maintaining that Appellant's argument that the military judge "failed to take into account what additional evidence the Defense could have discovered" is "entirely speculative [in] nature." The Government maintains "[t]he mere possibility that an item of undisclosed information might have helped the [D]efense" is insufficient to establish materiality, characterizing the Defense's proffered use of the withheld evidence as an "alternate universe." (First alteration in original).

Specifically, the Government states motive to fabricate on EE's part does not change other eyewitness testimony that Appellant came into their lane or negate the experts' consensus that some part of her car crossed into the other lane to some degree. Further, the Government argues that the bias and motive of the undisclosed accident reconstruction expert would be apparent because he was hired, and his testimony immaterial because he only reviewed "photos and the scatter patterns of the wreck." Finally, the Government asserts that the testimony of the undisclosed reconstructionist amounts merely to cumulative expert disagreement.

As to prejudice, the Government argues that even if disclosure of the withheld evidence was required there was no prejudice, and that the harmless beyond a reasonable doubt standard does not apply given that Appellant concedes that she "did not make a specific request" for the civil litigation information, and because there was no finding of prosecutorial misconduct. The Government maintains the military judge reasonably concluded that "the [G]overnment was 'not required to dig further into the particularities of the civil litigation'" and that "R.C.M. 701(a)(6) 'generally does not place on the Government the duty to search for exculpatory evidence held by people or entities not under the control of the [G]overnment.'"

## II. DISCUSSION

### A. Law on Discovery

#### 1. Standard of Review

This court reviews a military judge's rulings on discovery requests and remedies for discovery violations for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (citations omitted). "The abuse of discretion standard calls for more than a 'mere difference of opinion.'" *Id.* (quoting *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014)). An abuse of discretion occurs "when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Id.* at 480 (alteration in original) (quoting United *States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)). "Our review for prejudice is de novo." *United States v. Braum*, __ M.J. __, No. 25-0046, 2026 CAAF LEXIS 343, at *8 (C.A.A.F. 8 Apr. 2026) (quoting *United States v. Sigrah*, 82 M.J. 463, 467 (C.A.A.F. 2022)).

#### 2. *Brady v. Maryland* – Favorable and Material Evidence

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The same rule applies to impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). Evidence is "favorable" within the meaning of *Brady* "if it is exculpatory, substantive evidence, or evidence capable of impeaching the [G]overnment's case," and "material" if "there is a reasonable probability" the result of the proceeding would have been different had the evidence been disclosed. *United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) (citations omitted). "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted). Further, all withheld evidence must be considered cumulatively. *Kyles*, 514 U.S. at 437. *Kyles* also cautions that "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Id.* at 438.

"[F]avorable evidence" under *Brady* includes "evidence . . . that, if disclosed and used effectively, . . . may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citation omitted). Importantly, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in [an accused]'s acquittal . . . ." *Kyles*, 514 U.S. at 434. (citations

omitted). A reasonable probability does not mean that an accused "would more likely than not have received a different verdict with the evidence," but only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Id.* (internal quotation marks and citation omitted). In *Kyles*, the United States Supreme Court overturned the defendant's capital murder conviction based on the Government's failure to turn over pieces of exculpatory evidence, and how the defense could have used this evidence and not whether said evidence would be outcome determinative. 514 U.S. at 454. The court rejected the State's reliance on the apparent strength of the remaining evidence, holding that a *Brady* violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. *Kyles* deemed the withheld evidence material because the suppressed evidence would have enabled a "withering cross-examination," and exposed the "unreliability of the investigation," and constituted a failure to disclose evidence concerning the accused's possible innocence. *Id.* at 443, 451.

In *Roan*, 86 M.J. at 164, while investigating appellant's companion case, law enforcement discovered a workout powder in the common area of the appellant's apartment he shared with two roommates; learned that the powder contained dimethylhexylamine (DMHA); that despite containing this banned substance, the maker of the powder marketed itself to appear FDA approved; and had interviewed a medical review officer (MRO) who opined the powder could potentially cause false positives for cocaine. This information was not disclosed to the defense in a wrongful use of cocaine case based solely on a positive urinalysis. *Id.* The United States Court of Appeals for the Armed Forces (CAAF) emphasized that in analyzing materiality, "[t]he question is not what was raised at trial, but what could have been raised had this information been disclosed." *Id*. Applying this standard, the CAAF held the evidence was material under *Brady* because it could have supported an innocent ingestion defense strategy and "would have rebutted the permissive inference of knowing and wrongful use instruction." *Id*. Further, the appellant was "not required to show a link to himself and the protein powder." *Id.* at 165.

R.C.M. 701(a)(6) provides that:

> [t]rial counsel shall, as soon as practicable, disclose to the defense the existence of evidence known to trial counsel which reasonably tends to—(A) Negate the guilt of the accused for an offense charged; (B) Reduce the degree of guilt of the accused of an offense charged; (C) Reduce the punishment; or (D) Adversely affect the credibility of any prosecution witness or evidence.

"[T]rial counsel must review their own case files and must also exercise due diligence and good faith in learning about any evidence favorable to the defense 'known to the others acting on the [G]overnment's behalf in the case, including the police.'" *Stellato,* 74 M.J. at 486 (quoting *United States v. Williams,* 50 M.J. 436, 441 (C.A.A.F. 1999)).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 [ ], as implemented by R.C.M. 701–703." *United States v. Coleman,* 72 M.J. 184, 186–87 (C.A.A.F. 2013) (footnotes omitted). Article 46, UCMJ, and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the United States Constitution. *Coleman*, 72 M.J. at 187 (citing *United States v. Roberts,* 59 M.J. 323, 327 (C.A.A.F. 2004)) (additional citation omitted).

Where prosecutorial misconduct is present or where the Government fails to disclose discoverable information pursuant to a specific request, the appellant will be entitled to relief unless the Government can show that the failure to disclose is harmless beyond a reasonable doubt. *United States v. Hart*, 29 M.J. 407, 410 (C.M.A. 1990); *see also Roberts*, 59 M.J. at 327 (concluding that shifting the burden to the Government "reflects the broad nature of discovery rights granted the military accused under Article 46[, UCMJ]").

## B. Analysis

### 1. Standard of Review

The military judge ruled "[e]vidence of civil litigation in the [G]overnment's possession is discoverable and should have been turned over pursuant to R.C.M. 701." With this much we agree. The Government was in possession of a summons for Appellant's appearance in a German district court involving a trial over virtually the same issue for which she was being prosecuted – who caused this collision. Additionally, as acknowledged by the Government in the R.C.M. 802 hearing following EE's presentencing testimony, the Government knew of the existence of the third accident reconstruction expert who, according to the German Regional Court filing eventually turned over to the Defense, opined that EE, not Appellant, was at fault for the collision. This constituted "evidence known to trial counsel which reasonably tend[ed] to . . . [a]dversely affect the credibility of any prosecution witness or evidence," and therefore R.C.M. 701(a)(6) required disclosure to the Defense "as soon as practicable."

The question then becomes whether the non-disclosure constitutes prosecutorial misconduct, thereby shifting the burden to the Government to demonstrate the failure to disclose was harmless beyond a reasonable doubt, *see Roberts, supra*; or alternatively, whether there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *See Kyles*, 514 U.S. at 434; *Behenna*, 71 M.J. at 238. We are also mindful

of the Supreme Court's observation in *United States v. Agurs*, 427 U.S. 97, 113 (1976), that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

We find it telling that the Government notified the Defense that EE was currently involved in German civil litigation over his involvement in a 2021 automobile accident, indicating they knew of their discovery obligations, but elected not to notify the Defense about a trial date just weeks following Appellant's court-martial specifically involving EE and Appellant. Indeed, notice of the 2021 accident litigation would likely lead trial defense counsel to maintain the reasonable belief that the Government would have advised of all pending litigation. The Government was also aware of a third expert who opined EE was the cause of the collision where causation was the principal issue in the court-martial.[13] We are unpersuaded that a reference in an email from the base legal office that "civil proceedings after traffic accidents . . . are the usual procedure in Germany" relieved the Government of its obligations to turn over actual evidence in its possession involving current civil litigation specifically involving Appellant. Indeed, the day after receipt of this email, trial defense counsel inquired whether "documents associated" with the court-appointed expert's evaluation regarding "causation of the accident" that occurred in 2021 would be provided.

The discovery rules in the military justice system are designed, *inter alia*, to eliminate pretrial gamesmanship, and reduce surprise and delay, as manifested in the present case. *See, e.g.*, *United States v. Jackson*, 59 M.J. 330, 333 (C.A.A.F. 2004). That said, the concept of prosecutorial misconduct is broad. *See United States v. Andrews*, 77 M.J. 393, 402 (C.A.A.F. 2018) ("Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996))). However, as this court articulated in *United States v. Doroteo*, "in the context of discovery obligations, it cannot be so broad as to encompass every violation of R.C.M. 701(a)(6); otherwise, the two-tiered prejudice test for discovery violations our superior court has set forth would have only one tier." No. 40363, 2025 CCA LEXIS 49, at *32 (A.F. Ct. Crim. App. 7 Feb. 2025) (unpub. op.) (citing *Coleman*, 72 M.J. at 187). We

---

[13] Following the R.C.M. 802 hearing held following EE's presentencing testimony, the Defense placed on the record, unopposed, that "the [G]overnment had knowledge that an accident reconstructionist was involved in [the] civil hearing . . . ." Additionally, the Government provided the defense with Mr. DF's court filings that included the "expert opinion" that EE caused the collision.

assume, for purposes of our analysis, that the discovery violation in this case did not constitute prosecutorial misconduct and therefore that the heightened beyond a reasonable doubt prejudice standard does not apply. For reasons articulated with respect to the materiality of the withheld information below, we find "there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed." *Jackson*, 59 M.J. at 334.

### 2. Favorable Evidence

The military judge abused his discretion when he ruled the withheld evidence was not favorable. The military judge's conclusion that civil litigation involving the identical parties and by and large the same central issue, could not reveal favorable information, is misplaced. We view the evidence of civil litigation and the third-party expert opinion as to fault favorable as it furnished potent impeachment evidence of EE, the Government's principal fact witness, his passengers, as well as the Government expert's conclusions. Additionally, the third-party expert's opinion that Appellant did not cause the collision undoubtedly constitutes exculpatory evidence, and underscores Appellant's right to defend against and present a competing theory of causation.

### 3. Materiality of the Evidence

#### a. The Military Judge Misapplied Kyles and Roan

Appellant avers the military judge erred in ruling the evidence was not material because the Government's evidence was "considerable." We agree with Appellant. The military judge essentially applied a sufficiency of the evidence standard citing the "the current case posture;" that is, Appellant already stood convicted. This is evidenced by the military judge's responses to the Defense's prejudice argument during the motion: "[W]e already have findings in this case, correct?" and, "[W]e're not going to relitigate the case here." However, *Kyles* and *Roan* command review of how the Defense could have used the evidence had it been disclosed. Trial defense counsel emphasized this point during argument on the motion, stating, "[W]hat we do have here is the fact that the [G]overnment did not disclose that civil litigation and [Appellant] was not allowed to pursue that additional evidence . . . ." Trial defense counsel further argued that the non-disclosure was "going to cause [Appellant] forever to wonder whether if she had that evidence [during findings]," would she "have had a different outcome at trial."

Further, the military judge's reasoning that "the [G]overnment was not required to dig further into the particularities of the civil litigation" because R.C.M. 701(a)(6) does not require the Prosecution to search for evidence "held by people or entities not under the control of the government" is flawed. In the case *sub judice*, the issue is not a lack of knowledge on the part of the

Government or whether they had a duty to search beyond files in their possession. The information was in their files. The Government knew of the civil lawsuit, was in possession of a summons for Appellant's appearance, and it disclosed during the R.C.M. 802 conference following Appellant's conviction that it knew of the third expert's opinion regarding causation of the collision.

### b. Impeachment of EE

With respect to potential cross-examination of EE based on his economic interest, the military judge ruled "the addition of this potential information would not have risen to meet the materiality standard." We believe the military judge considerably underestimated the impeachment value of this potential bias. Though the record contains little detail regarding EE's 2021 vehicle accident, the fact is at the time of Appellant's court-martial, he was involved in civil litigation over two separate automobile accidents. At the time he testified at Appellant's court-martial, he was the identified plaintiff in a case against Appellant pending adjudication over fault scheduled just weeks following Appellant's court-martial. Per the notes from EE's pretrial Government interview, EE could "not get rid of loan payments," he was "not able to purchase a new vehicle," and he "[had] an attorney to coord[inate] insurance, civil matter in the [G]erman court." According to EE's presentencing testimony following the denial of the Defense's motion, EE testified with respect to whether he had been paid by his insurance company stating, "So in all these months up to this day I need to pay around €12,500." Thus, EE was in a difficult monetary position, invested with a significant financial motive to shift all liability to Appellant.[14]

Furthermore, while the record is not clear how the Government came to possess the 27 December 2023 court filing that it attached to its response to the Defense's Motion to Dismiss, the fact remains it was in their possession. That filing attributes fault for the collision to EE and rests its analysis on an "expert opinion." Following the R.C.M. 802 conference the military judge held with the parties following EE's presentencing testimony, trial defense counsel placed on the record that the "[G]overnment had knowledge that an accident reconstructionist was involved in [the] civil hearing" who had determined that EE was at fault for the accident. We do not find it a leap to conclude EE knew of this expert's conclusions at the time of Appellant's court-martial. This development, along with EE's financial motive, could have fueled sharp cross-examination, further diminishing EE's credibility.

---

[14] A witness may be impeached by evidence of "[b]ias, prejudice, or any motive to misrepresent." Mil. R. Evid. 608(c).

While it is true the Government could have attempted to rehabilitate EE with potential prior consistent statements he made to on-scene police, EE was also already involved in a 2021 automobile accident, arguably with an existing motive to fabricate. Regardless, his credibility was a matter for the factfinders, who were deprived of this evidence.

Additionally, EE omitted any reference to the fact that he was a party to any litigation during his pretrial interview with trial defense counsel. While the record does not reflect every detail of the Defense's pretrial interview of EE, it appears from Ms. EH's testimony that EE's interview occurred on the eve of trial due to scheduling difficulties with EE, and that EE was not asked direct questions about litigation. This was a missed opportunity by the Defense to inquire into the extent of any damages. At the same time, EE's silence on the fact that he was a plaintiff in a lawsuit against Appellant scheduled in a few weeks claiming monetary damages would have been another potential line of cross-examination.

The civil litigation expert's conclusion that EE caused the accident also constitutes impeachment by contradiction of EE's version of events, even if not used during his cross-examination. While EE's motives alone constitute a substantial cross-examination topic, all withheld evidence must be considered cumulatively. *Kyles*, 514 U.S. at 437. This brings us to additional ways the withheld evidence could have been used by Appellant's trial defense counsel.

### c. Third-Party Accident Reconstruction Expert

Though much appears unknown of the undisclosed third-party accident reconstruction expert,[15] what the uncontradicted record does show is that he, unlike the other two experts, did determine who caused the accident – EE and not Appellant. For several reasons, we cannot conclude, as did the military judge, that his testimony at Appellant's trial would have been cumulative to the expert testimony of Mr. MS, the defense accident reconstruction expert.

First, when alerted by the Government that there was an expert involved in EE's 2021 collision, trial defense counsel requested the report. We conclude the Defense would likewise have obtained the undisclosed expert's reconstruction report in this case, and reviewed the expert's methods, analysis and conclusions. The Defense would have been armed, should it have so elected, with a potential litigation strategy centering around a concrete conclusion that EE caused the collision, and shaped the litigation accordingly, to include voir dire, opening, closing, and cross-examination of the Government's expert, Mr. FH.

---

[15] We presume this is the "expert opinion" of the reconstructionist referred to in attorney Mr. DF's 27 December 2023 court filing.

Second, we cannot exclude the possibility that the Defense would have called this expert to testify regarding his causation findings, rather than call him *in addition* to their expert Mr. MS, as assumed by the military judge and the Government.

Third, even if the Defense were to call both experts, the undisclosed expert's opinion that "it is clear that [EE] had left his lane" and that Appellant had no "opportunity to avoid the collision," would not have been cumulative with Mr. MS's *inconclusive* opinion as to fault. Additionally, the means and methods of this expert, described by the attorney Mr. DF as "proprietary," could have been used by the Defense to challenge the conclusions of the Government expert, Mr. FH. We are also unpersuaded by the Government's argument that the bias of this defense expert would be "obvious," but that its uncertified expert would not be subject to the same observation. The Defense's theory could have been founded on an alternative-causation theory supported by a professional accident reconstruction expert who concluded EE left his lane and caused an unavoidable collision. This could have significantly undercut the Government's theory of causation, the central issue in the case, and caused reasonable doubt by the factfinders.

### d. Cross-Examination of Government Expert

While the Government's expert, Mr. FH, opined the collision occurred "slightly on the side of [EE's] lane," he also testified on direct that he "cannot exclude that at the moment of the collision part of [EE's] vehicle [was] also on the [Appellant's] lane. He also testified that Appellant's speed was "no[t] [a] significant factor" of the collision. Ultimately, he testified, "I cannot determine whose fault this was," and "I also cannot conclusively determine the cause of the accident." He was also critical of the evidence gathered by police, stating, it "could have been better" and there were "no detailed photos of [any of] the scratch marks" on the road.

The Defense's expert, Mr. MS, was also critical of the police investigation of the crash site. He testified that both he and Mr. FH agreed the police investigation in Appellant's case was "catastrophic," because it had such limited information. He opined it was possible the crash occurred "in the middle of the street" and agreed it was possible [EE and Appellant] could have entered each other's lanes. Additionally, he opined that while Appellant was traveling at 98 kilometers per hour, this was a safe speed and she was only several meters away from entering a speed zone permitting 100 kilometer per hour. Ultimately, he was unable to determine who was at fault for the collision.

Again, were the Defense aware of the opinion of the undisclosed expert, it would have been equipped with differing reconstruction techniques, analyses, and conclusions with which to cross-examine Mr. FH. While true the

undisclosed expert's analysis was not, apparently, based on a physical visit to the collision scene, the other two experts testified the local police's preservation and evidence gathering of the collision scene was poorly accomplished. Additionally, per the attorney Mr. DF, the third-party expert was certified, assigned to cases independently by the local courts, and utilized a "proprietary" method of accident reconstruction.

### 4. Summary

The Government became aware, no later than 13 March 2024, five days prior to Appellant's court-martial, of civil litigation over the collision with which Appellant was criminally charged with causing. The Government consciously elected not to notify the Defense. The Government also knew that a third-party expert accident reconstructionist concluded EE caused the collision by veering out of his lane. At the time of Appellant's court-martial, EE was involved in two lawsuits over his involvement in automobile collisions, with €12,500 at stake stemming from his collision with Appellant. There was no evidence presented to conclude Appellant was aware of this litigation before that date; all evidence points to the contrary.

In conducting our prejudice assessment, we do bear in mind that disclosure of the withheld evidence would not have undercut every aspect of the Government's case. The Government relied on alcohol consumption as a circumstance of Appellant's charged recklessness. It is true that Appellant registered a BAC of .04 following the collision. The Government's forensic toxicologist was only able, however, to testify in general terms and did not link any general alcohol effects specifically to Appellant, and was unable to estimate her BAC at the time of the collision. Appellant was also driving within the legal alcohol limit.

The Government also relied on speeding to demonstrate recklessness. While neither expert who testified could determine either the location of the collision, who entered whose lane, or who caused it, both experts concluded speed was not a factor in determining the cause of the collision, or was insignificant altogether.

This case resembles *Kyles* in that the suppressed evidence would have enabled powerful cross-examination of the principal government witness on the central issue in the case; exposed weaknesses in the Government expert's conclusions with contradictory expert findings; and supported an alternative narrative of liability. This additional evidence would have altered the factfinders' evaluation of the strength of the Prosecution's case.

We hold the additional undisclosed evidence, viewed in the context of the court-martial as a whole, undermines our confidence in the verdict, and was thus favorable and material to Appellant's guilt or innocence. Accordingly, Appellant is entitled to relief with respect to Charge I and its Specification.

### III. CONCLUSION

The findings of guilty to the Specification of Charge I and Charge I, and the sentence, are **SET ASIDE**. Article 66(d), UCMJ, 10 U.S.C. § 866(d). A rehearing is authorized. The record is returned to The Judge Advocate General for further proceedings consistent with this opinion.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court